**EXHIBIT "D"**

IN THE COURT OF QUEEN'S BENCH OF ALBERTA
JUDICIAL DISTRICT OF EDMONTON

No. 0803-04506

**COPY**

BETWEEN:

MOHAMED FODA and MOHAMED FODA PROFESSIONAL CORPORATION

Plaintiffs

- and -

JOHN DOE and/or JANE DOE

Defendants

This is Exhibit " D " referred to in the
Affidavit of
Mohamed foda
Sworn before me this____25th____ day
of_____May_____ A.D.,20 10

A Notary Public, A Commissioner for Oaths
in and for the Province of Alberta

Patty P. Ko
Barrister & Solicitor

------------------------------------------------------

CROSS-EXAMINATION ON AFFIDAVIT,
SWORN MAY 22, 2009,

OF

ROBERT MARTIN

------------------------------------------------------

R.B. White, Q.C.                    For the Plaintiffs

N. Schultz, Ms.                     For the Plaintiffs

S.N. Finlay, Ms.                    For Alberta Health
                                    Services

J. Weigl, CSR(A), RPR, CRR          Official Court Reporter

Edmonton, Alberta
June 26, 2009

*A.C.E. Reporting Services Inc.*
Phone: (780) 497-4223

This is Exhibit " ___ " referred to in the
Affidavit of ___

Sworn before me this ___ day
of ___ A.D., 20___

___
A Notary Public, A Commissioner for Oaths
in and for the Province of Alberta



2

## INDEX

### INDEX OF EXHIBITS

| NO. | DESCRIPTION | PAGE |
|-----|-------------|------|
| D-1 | AFFIDAVIT OF ROBERT MARTIN, SWORN MAY 22, 2009 | 3 |
| D-2 | AFFIDAVIT OF MICHAEL SOROCHAN, SWORN FEBRUARY 19, 2009 | 4 |

3

```
1    ROBERT MARTIN, SWORN AT 11:39 A.M., CROSS-EXAMINED BY
2         MR. WHITE:
3    Q    MR. WHITE:           Mr. Martin, thank you for
4         coming.
5    A    No problem.
6    Q    We have a little ritual we have to go through for
7         procedure's sake at the commencement.  I'm showing
8         you what I believe to be a true copy of your --
9         this isn't clean.
10             Your counsel has filed the original with the
11        Courts, and this is a photocopy.  If you, with your
12        lawyer's help, would acknowledge that that is a
13        true copy of your affidavit.
14   MR. WHITE:              I can assure you it is.
15   MS. FINLAY:             Yes.
16   MR. WHITE:              I haven't gone through and
17        changed the words.
18   Q    All right?
19   A    Yes.
20   MR. WHITE:              That will be Exhibit D-1,
21        please:  Affidavit of Robert Martin, sworn May 22,
22        2009.
23                           EXHIBIT D-1 :
24        AFFIDAVIT OF ROBERT MARTIN, SWORN MAY 22, 2009.
25   Q    MR. WHITE:           Mr. Martin, I've also shown
26        you a copy of the affidavit of Michael Sorochan,
27        which was filed in this action on February 24th,
```

4

1    2009, and I'm sure that you have read it before.

2  A   Yes.

3  MR. WHITE:                 Exhibit D-2, please:

4    Affidavit of Michael Sorochan, sworn 19 February

5    2009.

6                    EXHIBIT D-2 :

7    AFFIDAVIT OF MICHAEL SOROCHAN, SWORN FEBRUARY 19,

8    2009.

9  Q   MR. WHITE:              With respect to Exhibit D-2,

10    Mr. Martin, is there anything in it that you do not

11    agree with?

12  MS. FINLAY:               Don't answer that question.

13    Are you going to point him to something specific?

14  MR. WHITE:                No.  What I'm endeavoring to

15    do is establish the degree to which we are not in

16    disagreement.  I don't think we disagree about --

17    or we may not disagree about anything.

18        And I can go through and put Mr. Sorochan's

19    statements to him in the form of questions if

20    that's what you'd like.  I don't mind.

21  MS. FINLAY:               Well, this is not his

22    affidavit.  If --

23  MR. WHITE:                Okay.  Let me do this.

24  Q   You are aware, sir, from reading Mr. Sorochan's

25    affidavit that the United States District Court for

26    the Northern District of California, the San Jose

27    Division, issued an order against RATEMDS Inc.,

5

```
1         correct?
2    A    Sorry, yes.
3    Q    And that by that order, the Court commanded RATEMDS
4         to turn over to it certain documents, correct?
5    A    Yes.
6    Q    And as I understand it, the import of the order was
7         that RATEMDS -- which is what I'll call it -- was
8         to turn over documents which could identify -- they
9         say "does," but we know it could identify --
10        individuals who logged onto the RATEMDS web site.
11            Is that your understanding also?  It's page 2
12        of the amendment to the subpoena, under the heading
13        Document Request No. 1.
14   MS. FINLAY:              You can answer the question.
15        Can you ask your question again?
16   MR. WHITE:               Certainly.
17   Q    My understanding is that the import of the order
18        was for RATEMDS to turn over any documents.  And
19        they say -- it's written as though it's documents
20        that will do it; but as I understand it, it should
21        say documents that could be used to identify an
22        individual or individuals who logged onto and made
23        entries on the WebMD (sic) web site?
24   MS. FINLAY:              Well, you're not asking him to
25        give his opinion about whether that's what that
26        document does?  I mean, it says what it says,
27        right?
```

1    MR. WHITE:              Well, yes, of course it does.

2    MS. FINLAY:             And he's admitted to you that

3         he's read the affidavit.

4    MR. WHITE:              Well, all right.

5    Q    Have you yourself ever gone to www.RATEMDS.com?

6    MS. FINLAY:             Why is that relevant?

7    MR. WHITE:              Because I would like to know

8         what he knows about the web site in which I have an

9         interest.  Why isn't it relevant?

10   MS. FINLAY:             Well, it's not relevant to his

11        evidence.  His evidence is related to the IP

12        address.

13   MR. WHITE:              For a very long time, the law

14        in this province has been that a cross-examination

15        on an affidavit is not limited to the four corners

16        of the affidavit, but rather deals with all matters

17        which are relevant to the point in issue.

18            The point in issue is whether or not the

19        person who has responded to our motion can or

20        cannot identify the people who made certain entries

21        on the RATEMDS web site; and any information that

22        is relevant to the determination of the identity of

23        those people is a proper -- is within the subject

24        matter permitted for cross-examination on this

25        affidavit.

26            It does not have to be a question which is

27        derived from anything which is said in Mr. Martin's

7

```
 1        affidavit.  That's been the law for at least 20
 2        years.
 3   MS. FINLAY:            Well, this motion relates to
 4        comments that were posted in November of 2007.
 5   MR. WHITE:            Yes.
 6   MS. FINLAY:            So Mr. Martin has indicated
 7        that he started working at Capital Health in
 8        December of 2007.  So I'm still struggling with the
 9        relevance of your question vis-a-vis this witness.
10   MR. WHITE:            Well, because perhaps you
11        haven't gone and looked at the RATEMDS web site.  I
12        don't know.  But looking at a web site, a person
13        who appears to have the qualifications which your
14        client has can learn a fair amount by looking at a
15        web site.
16            I'm not an expert.  My oldest son is a senior
17        project developer for Microsoft in Washington, and
18        he's taught me a lot, but I certainly don't know
19        what Mr. Martin knows, and I'm going to find out
20        what he knows.
21            So let me, to satisfy you, start another way.
22   Q   Do you have any reason to believe, sir, that were
23        you to look at the RATEMDS web site, it would give
24        you any information which would be of any possible
25        assistance to you in providing the information
26        which is being sought?
27   A   No.
```

8

```
1    MR. WHITE:              Can you read it back for me?
2    COURT REPORTER (By reading):
3            Q  Do you have any reason to
4               believe, sir, that were you to
5               look at the RATEMDS web site, it
6               would give you any information
7               which would be of any possible
8               assistance to you in providing
9               the information which is being
10              sought?
11           A  No.
12   Q   MR. WHITE:            And is that based on personal
13       information or theoretical understanding of the
14       World Wide Web?
15   A   Theoretical understanding of the operations of the
16       World Wide Web.
17   Q   Good.  Now, staying with the order of the United
18       States District Court, if you look at Sheet 1, I'm
19       interested, sir, in the third column, which is
20       designated in small letters IP.  Do you see it?
21   A   I do.
22   Q   And under IP in that third column on Sheet 1, which
23       consists of two pages, are a series of number
24       clusters separated by periods.  What are those
25       numbers?
26   A   Specifically or generically?
27   Q   Generically.
```

9

```
 1   A   They're the -- they appear to be the IP address of
 2       the computers that accessed the RATEMDS.com.
 3   Q   And what is the IP address of a computer?
 4   A   How detailed do I get with this answer?
 5   Q   Well, what is it?  I mean, if I ask you, what's
 6       your home address, you say that's the address by
 7       which you would be able to locate my home.
 8            What's an IP address?
 9   A   It's the address by which you would be able to
10       locate a computer.
11   Q   And the IP address is unique to a given computer?
12   A   Yes.
13   Q   And so if one were to know the IP address of a
14       given computer and one were to know that there had
15       been access to a web site by a computer with that
16       IP address, you would know it was the same
17       computer?
18   A   Yes.
19   Q   Yes.
20   MS. FINLAY:            I'm sorry, are your questions
21       generic or specific?
22   MR. WHITE:             Well, right now they're
23       generic obviously.
24   MS. FINLAY:            Thank you.
25   MR. WHITE:             Just off the record.
26   (DISCUSSION OFF THE RECORD)
27   Q   MR. WHITE:         What is a firewall?
```

1   A   It's a device that provides separation, logical
2       separation, between two networks.
3   Q   And as I understand it -- for example, you know, at
4       home we have a little home network, and I have a
5       firewall.  As I understand it, a firewall is to
6       keep information from the World Wide Web getting
7       into my home network that I don't want getting into
8       my network.
9   A   Sure, absolutely.
10  Q   In your mind, is "World Wide Web" and "Internet"
11      synonymous, or is World Wide Web --
12  A   No, it's a service on top of the Internet.
13  Q   Right.  And does a firewall perform any function
14      other than keeping out of one network information
15      that the network doesn't want to receive?
16  A   In some cases, a firewall can be configured to
17      isolate internal IP addresses so that they appear
18      to only be one single external IP address.
19  Q   So that, for example, my wife's computer has an IP
20      address, and my computer has an IP address, and
21      they're different?
22  A   Right.
23  Q   But it's possible for me to configure the firewall
24      so that when we send information out of our network
25      into the world, into the Internet, it would --
26      whichever of the two computers which it originated,
27      it would not appear that it had originated from two

```
 1        computers?
 2    A   Correct.
 3    Q   And that's what yours does?
 4    A   By "yours," you mean --
 5    Q   The people you work for.
 6    A   Yes.
 7    Q   And you're employed by?
 8    A   Alberta Health Services.
 9    Q   And before that?
10    A   Well, legally we were called Capital Health before
11        that, but --
12    Q   You were Capital Health before that, and now
13        you're --
14    A   I didn't hear that.  Sorry, what did you say?
15    Q   I say, You were Capital Health before that?
16    A   Yes.
17    Q   And now you're Alberta Health Services?
18    A   Yes.
19    Q   Now, and has your job description changed as a
20        result of Capital Health Services ceasing operation
21        and that operation being taken over by Alberta
22        Health Services?
23    A   The scope of my job is provincial versus regional,
24        but the responsibilities and accountabilities for
25        the most part have not changed.
26    Q   So you have more work to do?
27    A   Yeah, absolutely.
```

---

12

---

1  Q  Same job, more work?

2  A  Same pay, yeah.

3  Q  Same pay, yes.  Not even a bigger office?

4  A  Well, we moved to a new building, so I have a

5     bigger office, yes.

6  Q  Nicer computer, I hope.

7        Now, what is your job?  What do you do?

8  A  Are you specifically asking in Alberta Health

9     Services' context or what at the time I joined

10    Capital Health?

11 Q  Well, as I understand what you have just told me,

12    that the change from Capital Health to Alberta

13    Health has simply broadened the scope, not changed

14    the nature?

15 A  I'm sorry, I thought you asked for the title.

16    Sorry.

17 Q  No, no.

18 A  Sorry.  I thought you asked for title.  I'm

19    responsible for the information security controls

20    around protecting information and data within

21    Alberta Health Services.

22 Q  And what qualifies you to do that?

23 A  I have an Engineering degree; 15, 16 years of

24    industry experience; certifications; and that's

25    what qualifies me.

26 Q  And I take it that to perform the onerous function

27    which you have, that requires the establishment of

*13*

```
1        policies, and the procurement of appropriate
2        equipment and software, and the setting up of the
3        hardware?  You know, do it yourself:  The setting
4        up of the hardware and the implementation of the
5        software?
6    MS. FINLAY:              I'm sorry, can you break up
7        that question?
8    MR. WHITE:               Yes.
9    MS. FINLAY:              Because you've asked him
10       whether he's responsible for this and this and this
11       and this and this and this and --
12   MR. WHITE:               I certainly don't want to make
13       it too hard for Mr. Martin.
14   Q   So as part of your responsibilities, sir, to
15       establish policies --
16   A   Yes.
17   Q   And the policies which you are responsible to
18       establish deal with what?
19   A   Specifically around information security and the
20       technical administrative controls for protecting
21       the systems.
22   Q   And when did you establish those policies?
23   MS. FINLAY:              Wait a minute.  Are you
24       talking about a specific policy?
25   MR. WHITE:               No, I'm talking about all of
26       them.
27   MS. FINLAY:              So are you going to ask him
```

*14*

```
 1        about what policies he established in a particular
 2        year?
 3   MR. WHITE:              I'm not going to tell you what
 4        I'm going to ask him.  It's none of your business,
 5        with respect.
 6            This is a cross-examination, and Mr. Martin
 7        has had no trouble candidly telling me, as I have
 8        broken up the question in a way you have requested,
 9        that he establishes policies of a defined kind.
10            And I would like to know when he established
11        them; and it may be that they were all established
12        at once, or it may be that they were established at
13        different times, or were established and then
14        amended.  I don't know, and that's why I'm asking.
15   A    The policies that were current at Capital Health
16        were established by a predecessor and were not
17        amended prior to the formation of Alberta Health
18        Services.
19   Q    MR. WHITE:              And although you were
20        responsible for those policies, you were not the
21        person who developed them?
22   A    Correct.
23   Q    Of course you reviewed them --
24   A    Yes.
25   Q    -- to determine their adequacy?
26   A    Yes.
27   Q    And what did you conclude?
```

15

```
 1    A    Can I --
 2    Q    No.
 3    A    Okay.
 4    MS. FINLAY:            If you can't answer the
 5         question because it's too broad --
 6    MR. WHITE:             You don't know why he can't
 7         answer the question.
 8    MS. FINLAY:            That's why I'm saying "if."
 9    MR. WHITE:             Because you can't read minds.
10    Q    You reviewed the policies; did you consider any of
11         the policies inadequate?
12    A    No.
13    Q    Did you consider that the policies were deficient
14         in any way?
15    A    I'm a bit of a stickler with regards to wording, so
16         I would have liked the wording to be a little bit
17         cleaner.  That's where I'm hesitant.
18    Q    Yes.  And I am too, so I understand.  So why didn't
19         you change them?
20    A    Due to operational constraints and project timing.
21         We were scheduled to review and revise policies,
22         and right around the time, loosely, that the
23         Alberta Health Services organization was announced.
24              So at that point in time, it didn't make any
25         sense to expend any effort on reviewing policies in
26         any great detail.
27    Q    I'm sorry, what are "operational constraints"?
```

```
1        Money?
2    A   People.
3    Q   People?
4    A   Yeah, so money.
5    Q   Resources?
6    A   Resources, yes, absolutely.
7    Q   And did you conclude that there were policies that
8        were not in place that there should be?
9    MS. FINLAY:              Are you asking for his opinion
10       here?
11   MR. WHITE:               I'm asking for the conclusions
12       he reached.
13   MS. FINLAY:              Well, is that not asking for
14       his opinion?
15   MR. WHITE:               Well, he looked at the
16       policies; he's told me what he thought about them.
17   MS. FINLAY:              I guess I'm struggling a
18       little bit to see what relevance this has exactly
19       to the issues here and the evidence that he's
20       given.
21           I understand you're able to look broadly at
22       the evidence and ask questions about it, but it
23       seems to me you're getting outside of the bounds of
24       what's relevant.
25   MR. WHITE:               I certainly am sorry that you
26       are struggling with it, but I assure you if you're
27       patient, all things will become clear to you.
```

1   Q  Did you conclude that there should be policies that

2      there were not?

3  MS. FINLAY:           We'll take this question under

4      advisement.

5  MR. WHITE:            This is a cross-examination,

6      so you can either answer it or refuse to answer it.

7      It's not a discovery.

8   A  Just to be clear, can you repeat the question?

9   Q  MR. WHITE:         Sure.  After your review of

10     the policies, did you think there should be any

11     more policies?

12   A  No.

13   Q  Okay.  So much easier when we just answer the

14     questions.

15         Now then, the network for which you were

16     responsible at Capital Health, is there a name I

17     should use for it, or is it adequate to call it the

18     Capital Health network?

19   A  The Capital Health network is sufficient.  I'm not

20     entirely solely responsible for that though.

21   Q  You mean you're responsible for things other than

22     the Capital Health network?

23   A  No, sorry, what I mean by that is that the

24     operational hands-on work is not done by myself or

25     my team.

26   Q  And you don't supervise it?

27   A  Correct, I do not supervise.

18

```
1    Q    So there's an Operations team?

2    A    Yes.

3    Q    Yes.  And your team is called?

4    A    Well, it's called Security and Compliance, but

5         Governance Risk and Compliance is an industry term.

6    Q    Yes, I understand.

7    A    Yes.

8    Q    I understand that.  And Operations must be in

9         compliance with your policies?

10   A    Yes.

11   Q    And how do you make sure they are?

12   A    Internal and external -- externally contracted

13        reviews and audits, and that pretty much sums it

14        up.

15   Q    The Capital Health network now, and speaking of its

16        hardware -- we'll start with the client at the end

17        of the line -- how many personal computers?

18   A    I'm hesitating because I'm more familiar with the

19        AHS numbers than the Capital Health numbers right

20        now.

21   Q    Yes.

22   A    But it's around 18,000.

23   Q    Around 18,000 computers.  And all of them desktop,

24        or all of them laptop, or some desktop and some

25        laptop?

26   A    A mix.

27   Q    A mix?
```

19

```
 1  A  M-hm.
 2  Q  And but all of them connectible without
 3     restrictions to the Capital Health network?
 4  A  Do you mean that they can plug into the network and
 5     get access to Capital Health?  Yes, so there's no
 6     restrictions.
 7  Q  So, yes, that's what I wanted to be sure of.  And I
 8     don't want to have asked a question so inelegantly
 9     so it can be confused.
10         I asked if I could call the network the
11     Capital Health network, and you're okay with that?
12  A  M-hm.
13  Q  And then roughly how many computers in the Capital
14     Health network, and you told me 16 hundred --
15  A  Thousand.
16  Q  -- 16,000 (sic) roughly; and that some of those
17     computers are what we called desktop, and others
18     are laptop, correct?
19  A  Correct.
20  Q  And each of those desktop or laptop computers,
21     given that they're clients in the Capital Health
22     network, can connect to the Capital Health network?
23  A  Yes.
24  Q  Without restriction?
25  A  Yes.
26  Q  One computer can as well as any other computer?
27  A  Yes.
```

---
20
---

1  Q  Now, each of those 16,000 computers has a unique IP
2     address?
3  A  On the internal Capital Health network, yes.
4  Q  Within the network?
5  A  Within the network, yes.
6  Q  And you keep a record of it somewhere or other on
7     the server probably?
8  A  Yes.
9  Q  So that internally on the Capital Health network,
10    you can trace activity within the network to a
11    specific computer?
12 A  There are limitations to that, but theoretically
13    speaking, yes.
14 Q  What are the limitations?
15 A  The logs that we keep to say that this computer was
16    this IP address are only kept for a week, and so we
17    can't go back all the way back in history to say
18    this specific computer was this specific IP
19    address.
20 Q  So the 16,000 computers roughly in the network,
21    each computer did not always have the same IP
22    address?
23 A  No.
24 Q  Why?
25 A  From a purely management sense, it's ineffective --
26    sorry, inefficient to assign a single IP address to
27    a single computer.

```
1    Q   Why?
2    A   Because then it makes it difficult for a computer
3        or a network to be reconfigured to changing
4        business requirements to get onto certain portions
5        of the network.  And that's generic, not just
6        specific to Capital Health.
7    Q   Well, we'll see.  Tell me this:  Why then do you
8        keep a log of IP addresses at all?
9    A   Well, in situations where users would be
10       experiencing problems or when we're noticing
11       technical -- "we" being Capital Health
12       generically -- we notice technical issues on the
13       network, it is -- that's required information so
14       that we can pinpoint which computer is causing the
15       problems.
16   Q   And so if IP addresses are changed, let's say,
17       Monday at 1 p.m., and a computer experienced such a
18       technical issue at 12:55, at 1:05 you would be
19       unable to pinpoint the computer?
20   A   Yes.
21   Q   Must make life tough, doesn't it?
22   MS. FINLAY:              Is that a --
23   Q   MR. WHITE:              Doesn't that make life kind of
24       tough?
25   MS. FINLAY:              In what sense?  How is that --
26   Q   MR. WHITE:              Well, how do you ensure
27       compliance?  How do you know if the operator of --
```

22

```
1         a given operator is operating in compliance with
2         your policies if you cannot determine what computer
3         is doing what?
4    A    If a computer completely changed its network
5         configuration and had a problem at 5 to 1, it would
6         likely have a problem at 5 after 1, and we would be
7         able to track down which computer based on the IP
8         address.
9    Q    Now, you have mentioned -- no, you haven't yet.  In
10        what way did the Capital Health network interface
11        with the Internet?
12   A    Through the firewall.
13   Q    Yes, but how?
14   MS. FINLAY:              For what time?  Are we talking
15        about a particular time frame or for all time or --
16   MR. WHITE:               I don't know if it did it
17        different ways at different times.
18   MS. FINLAY:              Well, you're talking about
19        Capital Health?
20   MR. WHITE:               It strikes me Mr. Martin is
21        bright enough that he would know to say, It changed
22        over time.  And, yes, of course I asked, How did
23        the Capital Health network interface with the
24        Internet?  And therefore obviously I'm talking
25        about Capital Health.  It seems that way to me
26        anyway.
27   Q    So how did the Capital Health network interface
```

23

| | | |
|---|---|---|
| 1 | | with the Internet?  And you've said via or through |
| 2 | | the firewall? |
| 3 | A | M-hm. |
| 4 | Q | But how? |
| 5 | A | By a network connection that we procured through a |
| 6 | | Internet service provider. |
| 7 | Q | Who was? |
| 8 | A | It's -- it's either Telus or the SuperNet |
| 9 | | connection. |
| 10 | Q | Was there one gateway? |
| 11 | A | By "gateway" do you mean firewall?  Because that's |
| 12 | | sometimes a term that is used. |
| 13 | Q | It is, yes.  To get from within the Capital Health |
| 14 | | network onto the Internet, was there one portal? |
| 15 | A | Yes. |
| 16 | Q | And all of the computers obviously on the Capital |
| 17 | | Health network could access the Internet? |
| 18 | A | There are some -- some restrictions to that, but |
| 19 | | the vast majority have access to the Internet, yes. |
| 20 | Q | And where there are restrictions, is it that |
| 21 | | certain computers are restricted? |
| 22 | A | I'm not sure what else it would be, sorry. |
| 23 | Q | Pardon? |
| 24 | A | I'm not sure what else it would be.  The computers |
| 25 | | are restricted, or -- |
| 26 | Q | Certain computers cannot access the Internet? |
| 27 | A | Yes. |

24

```
 1   Q   And those computers, are they identified by their
 2       IP address?
 3   A   Yes.
 4   Q   And given that that IP address changes every week,
 5       how do you ensure that a computer which does not
 6       have access to the Internet under one IP address
 7       when it gets a new IP address does not have access
 8       to the Internet?
 9   MS. FINLAY:              Just can we go off the record
10       for a moment?
11   MR. WHITE:               No.
12   THE COURT REPORTER:      Both Counsel need to be in
13       agreement.
14   MS. FINLAY:              I'm not sure that his evidence
15       was that the IP address changes every week.
16   Q   MR. WHITE:           How often does the IP address
17       change?
18   MS. FINLAY:              Thank you.
19   A   The refresh time for the IP addresses is seven
20       days, but that doesn't necessarily imply that you
21       will get a different IP address.  You could keep it
22       for longer, depending --
23   Q   Sorry, I didn't hear you.
24   A   Sorry.  It isn't automatically changed every seven
25       days, but the refresh time where it will ask for a
26       new IP address would be seven days.
27   Q   And when a computer's IP address does not change at
```

25

1     the end of -- at a refresh time, is that deliberate

2     or coincidental that a computer has the same IP

3     address after refresh as before?

4  A  It's coincidental.

5  Q  Coincidental.  So there is no way to be sure that a

6     given computer has the same IP address before and

7     after the refresh period?

8  A  There's no way to predict to be sure.

9  Q  So then a computer which has restrictions on its

10    access to the Internet, and is identified by an IP

11    address, and after the refresh period -- other than

12    for a coincidence -- has a new IP address, how do

13    you ensure that that computer's restrictions on

14    access to the Internet are maintained?

15  A  The design of the Capital Health network is not one

16    logical network.  It is a series of sub-nets, to

17    use the terminology.  And a sub-network sub-net can

18    be configured to not have access to the Internet.

19  Q  Should I conclude from that that a computer which

20    has access limitations to the Internet, every one

21    of those computers is on a specific sub-net, and

22    that sub-net has restrictions on access to the

23    Internet?

24  A  The computers that are restricted are not limited

25    to a single sub-net.  There are different sub-nets

26    that have restrictions.

27  Q  How many sub-nets did the Capital Health network

26

| | | |
|---|---|---|
| 1 | | have? |
| 2 | A | I don't know off the top of my head. |
| 3 | Q | And did a given sub-net have unrestricted access to |
| 4 | | the Internet?  Yes or no? |
| 5 | A | Just to make sure I understand the question -- |
| 6 | Q | It's binary, isn't it? |
| 7 | A | I -- |
| 8 | Q | Look at a sub-net, and does the sub-net either have |
| 9 | | or not have access to the Internet? |
| 10 | MS. FINLAY: | If you don't understand the |
| 11 | | question, you can ask him to -- |
| 12 | A | That's what I'm trying to ask.  Sorry, so can |
| 13 | | you -- a sub-net -- |
| 14 | Q | MR. WHITE: | Well, it's binary.  You have a |
| 15 | | sub-net? |
| 16 | A | We have lots of sub-nets. |
| 17 | Q | We have -- we'll take a sub-net. |
| 18 | A | Generically speaking. |
| 19 | Q | And I'm asking for the binary alternative.  Does |
| 20 | | the sub-net have access to the Internet, not have |
| 21 | | access to the Internet, or some of each? |
| 22 | A | No, it is -- if a sub-net does not have access, |
| 23 | | then the sub-net does not have access. |
| 24 | Q | No computer on the sub-net then has access? |
| 25 | A | Correct. |
| 26 | Q | And, therefore, to come back, way back, to an |
| 27 | | earlier question, the way you can tell if a given |

27

```
1        computer has access to the Internet, should I
2        understand that is by knowing what sub-net it's
3        connected to?
4    A   Yes.
5    Q   And how are you able to tell to which sub-net a
6        given computer is connected?
7    A   By looking at its IP address.
8    Q   But its IP address changes?
9    A   The IP addresses would change within the sub-net
10       that they're in.  It's not just any old IP address
11       across Capital Health.
12   Q   So within a given sub-net, there was a range of
13       available IP addresses, was there?
14   A   For -- yes.
15   Q   And so for a given sub-net, computers connected to
16       that sub-net could only have an IP address within a
17       specified range?
18   A   Yes.
19   Q   And that was a policy administered by you but
20       implemented by Operations?
21   A   The policies that my group deal with wouldn't go to
22       that level of operational detail.
23   Q   But then do you know personally if within a given
24       sub-net a computer connected to that sub-net was
25       limited to a range of IP addresses?  Do you know
26       that?
27   A   I would have to get an answer to that question --
```

26

| | | |
|---|---|---|
| 1 | Q | You don't know? |
| 2 | A | -- from the technical people. |
| 3 | Q | You don't know? |
| 4 | A | If you gave me the specific sub-net, I'd have to |
| 5 | | ask the question, but I do not know. |
| 6 | Q | Yes.  Did you have a policy governing that matter? |
| 7 | A | No. |
| 8 | Q | No? |
| 9 | A | Governing the -- |
| 10 | Q | Was there a policy that you administered which said |
| 11 | | that when a sub-net has restricted access to the |
| 12 | | Internet, a computer connected to that sub-net can |
| 13 | | only have an IP address within a specific range? |
| 14 | A | No. |
| 15 | Q | So then based upon your personal knowledge, you do |
| 16 | | not know if a given computer could or could not at |
| 17 | | any point in time gain access to the Internet, |
| 18 | | could you?  You don't know that? |
| 19 | | You know the theory, but you don't know the |
| 20 | | practice, do you? |
| 21 | A | Correct. |
| 22 | Q | Now, to the degree that you understand it at all, |
| 23 | | roughly what proportion of the 16,000 computers had |
| 24 | | their access to the Internet restricted? |
| 25 | A | It's in the order of a few dozen. |
| 26 | Q | And the purpose of that restriction is what? |
| 27 | A | The computers are in situations where -- like in |

29

```
 1        acute-care facilities for children, they want to
 2        have access to the computer, but we don't give them
 3        access to the Internet to protect them.
 4    Q   Sorry?  You drop your voice.
 5    A   We don't give them access to the Internet just
 6        because they're kids, right.
 7    Q   You don't want kids who are using the computers in
 8        pediatric acute-care facilities logging onto the
 9        Internet?
10    A   Right.
11    Q   As much as they might want to do that?
12    A   Exactly.
13    Q   Any other restrictions?
14    A   None that I'm aware of.
15    Q   Now, the information that was kept and accessed and
16        manipulated on the Capital Health network was what,
17        consisted of what?
18    A   The information that was accessed?
19    Q   Well, that Capital Health network does something.
20        Networks and computers only do one thing:  They
21        manipulate data.  What data?
22    A   Internal Capital Health various business and
23        clinical systems.
24    Q   Including patient information?
25    A   M-hm.
26    Q   Sorry?
27    A   Yes, sorry.
```

30

```
 1    Q    Confidential patient information?
 2    A    Yes.
 3    Q    And as it applied to the network, did you have a
 4         FOIP policy?
 5    MS. FINLAY:              How is this relevant?
 6    MR. WHITE:               Patience.  Patience.  You'll
 7         shortly see.
 8    MS. FINLAY:              Well --
 9    A    My group did not administer the FOIP policy.
10    Q    MR. WHITE:          Was there one though?
11    A    In Capital Health, yes.
12    Q    Therefore, someone in the public at large to
13         warrant access to the data manipulated by the
14         Capital Health network, they were not entitled to
15         it as of right?
16    MS. FINLAY:              Are you asking him for a legal
17         question about what FOIP covers?
18    MR. WHITE:               No, I'm not even talking about
19         FOIP now.
20    MS. FINLAY:              Okay.
21    Q    MR. WHITE:          A member of the public at
22         large can't just log onto the Capital Health
23         network and get whatever information he or she
24         wants?
25    A    Correct.
26    Q    Because that's confidential information, among
27         other things?  You want to keep out Trojan horses
```

```
 1        and viruses and --
 2    A   Right.
 3    Q   -- worms and --
 4    A   Yes.
 5    Q   But in addition to worms and viruses and all
 6        Malware, a member of the public could not access
 7        the Capital Health network?
 8    A   Correct.
 9    Q   And that function was implemented by the firewall?
10    A   Yes.
11    Q   Now, you should still have Exhibit D-2 in front of
12        you.  Would you look at the second-last sheet of
13        paper, please.  And in the bottom right, you should
14        see Exhibit E stamped.  Do you see that?
15    A   Yes.
16    Q   Look at the second-last entry, which is dated
17        November 24th, 2007.
18    A   Yes.
19    Q   There's an IP address comment, and then
20        Mr. Sorochan has said that that IP address is
21        assigned to Capital Health.  Is that a true
22        statement?
23    A   That is.
24    Q   And the information then shows that on November
25        24th, 2007, a Capital Health IP was connected to
26        the RATEMDS web site, and someone using the Capital
27        Health network described Dr. Foda as scary.
```

1        Is that a function that Capital Health

2    authorizes?

3 MS. FINLAY:              Wait a minute.  What exactly

4    are you asking him for?

5 Q   MR. WHITE:            Does Capital Health -- you do

6    the policies -- authorize the users of your 16,000

7    client computers to go onto the Internet, go to a

8    site -- RATEMDS in this case -- and describe a

9    doctor as scary?  Is that an authorized use?

10 A   The policies are around protecting data and

11    systems.  They do not authorize specific behaviors.

12 Q   Do they prohibit specific behaviors?

13 A   The policies will prohibit accessing or propagating

14    hate-based, racist, or criminal activity functions.

15 Q   But other than that, should I understand that your

16    policies do not prohibit the user of one of your

17    16,000 computers from accessing the Internet for

18    any other purpose?

19 A   The policies -- the policies are around acceptable

20    use of the Internet, are to limit staff from doing

21    personal business on the Internet on these

22    computers.

23 Q   There's an easy way to do this, but -- well, I'll

24    try it the easy way, and then if that doesn't work,

25    I'll do it the hard way.

26        We're looking at that second-last entry on

27    Exhibit E.  Would you characterize that as personal

33

```
 1      business?
 2   MS. FINLAY:            Pardon me?
 3   Q   MR. WHITE:         Would you characterize that as
 4       personal business?
 5   MS. FINLAY:            He can't answer that.
 6   MR. WHITE:             That's what I thought.
 7   Q   What is personal business?
 8   MS. FINLAY:            As defined in the policy?
 9   MR. WHITE:             Well, he said that the policy
10       is designed, among other things, to keep staff from
11       using access to the Internet for personal business.
12   Q   Well, what's personal business?
13   A   Online banking, access to personal e-mail, the
14       typical things you would do at home from an
15       Internet connection.
16   Q   Sending e-mail?  You've said accessing e-mail.  Do
17       you include sending personal e-mail?
18   A   Sure, that's fair enough, yeah.
19   Q   And how do you enforce the policy that staff are
20       not to use any of your client computers to access
21       the Internet for personal business?
22   A   Through security controls such as the firewall and
23       complementary technologies that work in conjunction
24       with the firewall.
25   Q   The IP address 198.161.230.10, which we have agreed
26       is assigned to Capital Health, as I understand it
27       from your affidavit, you cannot tell us to what
```

34

```
 1        computer it refers?
 2    A   No, I think my affidavit says that that's the IP
 3        address of our firewall, the external IP address of
 4        our firewall, so that's what 198.161.230.10 is.
 5    Q   Yes, which means that you can't connect it to a
 6        given computer?
 7    A   I can connect it to the firewall.
 8    Q   Yes.  And, therefore, not to a given computer?
 9    A   Sorry, maybe I'm just being -- it's semantics,
10        because that is essentially a computer, so --
11    Q   Well, yes -- no, it isn't.  It's a computer that is
12        running software, and the software is the firewall,
13        isn't it?
14             Well, now come on.  Are you trying to tell us
15        that -- do you really believe that I think there's
16        a physical thing that you've got built up that's
17        called a firewall and data bounces off it?
18             Firewall is software that monitors incoming
19        data, and a set of algorithms determines whether to
20        allow that data onto the network, right?
21    A   Okay.
22    Q   Well, isn't it?
23    A   Yes.
24    Q   Yes.  That's software, isn't it?
25    A   It's also intrinsically linked with the hardware,
26        so --
27    Q   Well, of course.  All software runs on computers,
```

35

| | | |
|---|---|---|
| 1 | | doesn't it? |
| 2 | A | Fair enough. |
| 3 | Q | Is the IP 198, et cetera, permanently allocated to |
| 4 | | the firewall? |
| 5 | A | Yes. |
| 6 | Q | Now, from that IP -- I'm going to call it the 198 |
| 7 | | IP. |
| 8 | A | Fair enough. |
| 9 | Q | From the 198 IP, we know from what we have that |
| 10 | | something went from the 198 IP to the RATEMDS web |
| 11 | | site.  That much we know, don't we? |
| 12 | A | We do. |
| 13 | Q | How do we know how that data got from -- got to the |
| 14 | | 198 IP? |
| 15 | A | Sorry, I'll try to find it here. |
| 16 | Q | No, I -- |
| 17 | A | Exhibit D. |
| 18 | Q | I haven't -- well, I don't think I've made my |
| 19 | | question clear. |
| 20 | A | Sorry. |
| 21 | Q | We see that we have the firewall address, the 198 |
| 22 | | IP; and by backtracking, we know that data went |
| 23 | | from the 198 IP to the RATEMDS web site? |
| 24 | A | Yes. |
| 25 | Q | What I'll call the firewall to RATEMDS path.  We |
| 26 | | know that path? |
| 27 | A | Yes. |

36

| | | |
|---|---|---|
| 1 | Q | Now, from the 198 IP backwards to a client |
| 2 | | computer, how can we tell which computer sent that |
| 3 | | data to the 198 IP? |
| 4 | A | Well, theoretically the logs of the firewall would |
| 5 | | show the internal IP address and then the |
| 6 | | destination IP, the RATEMDS destination IP address. |
| 7 | Q | And was -- is there a log that shows the |
| 8 | | originating computer that sent this message to the |
| 9 | | 198 IP? |
| 10 | A | Unfortunately, we did an upgrade in January of |
| 11 | | 2008.  A new device firewall was put in -- |
| 12 | Q | System? |
| 13 | A | System, fair enough -- was put into use, and the |
| 14 | | firewall that was -- the system that was in play -- |
| 15 | | in place in November of 2007 has been |
| 16 | | decommissioned, and we don't have access to the |
| 17 | | logs that that firewall created. |
| 18 | Q | Why? |
| 19 | A | Because the system was decommissioned. |
| 20 | Q | But you can keep the logs? |
| 21 | A | But we didn't. |
| 22 | Q | But why? |
| 23 | A | We had no policy to say that we had to keep the |
| 24 | | logs. |
| 25 | Q | So how do you enforce the rules against misuse of |
| 26 | | client computers accessing the Internet if you |
| 27 | | don't keep the logs? |

37

```
1   A   Well, fair enough, but when we go into production
2       with a new system, the old system is there in case
3       we need to refer to that.  But after a period of
4       time, there was no policy or technical reason for
5       us to have those logs, so the system was
6       decommissioned.
7   Q   But you have a policy against using client
8       computers by staff for certain purposes?
9   A   Right, but we have no policy that says we have to
10      be able to absolutely definitively say for all time
11      that we know exactly what an IP address did what on
12      the Internet.
13  Q   And your policy then imposes what time?  For how
14      long do you?
15  A   Our policy doesn't specify a time.
16  Q   Now, a user of one of the Capital Health network
17      client computers, other than the pediatric ones,
18      can send e-mail out onto the Internet without
19      restriction, except the restriction you're not
20      supposed to say evil things, right?
21  A   Are you talking about using a Capital Health
22      Alberta Health Services e-mail.
23  Q   Somebody is sitting at a Capital Health client
24      computer; you've told me that except for what I
25      will call the pediatrics --
26  A   Yes.
27  Q   -- all of those computers have unrestricted access
```

36

```
1          to the Internet?
2    A     Sorry if I indicated that they have unrestricted
3          access.  There is still some filtering that happens
4          and some restrictions.
5    Q     Oh, well, I'm sorry, that is what you said, but
6          it's okay.  People misspeak.
7              So tell me, did any of the computers on the
8          Capital Health network have unrestricted access to
9          the Internet?
10   A     So to be clear, the pediatric case do not have
11         access to the Internet.
12   Q     I've said that.  Leave the pediatric.
13   A     I know.
14   MS. FINLAY:            Let him answer the question.
15   A     The other computers have access to the Internet,
16         but for the purposes of making sure that our staff
17         don't do the racist, sexist, criminal activities
18         that I referred to previously, there are
19         restrictions on accessing those category of sites
20         on the Internet.
21   Q     MR. WHITE:            So the restrictions are on
22         what Internet sites a client user can access?
23   A     Yeah.  There's a category of sites -- categories of
24         sites that users can't access, yes.
25   Q     Hate sites, porn sites?
26   A     Online betting.
27   Q     Gambling sites?
```

1   A   Yes.

2   Q   Because you see, you told me about the policy; you

3       didn't mention gambling or porn.  And we talked

4       about racist comments and criminal activity, and I

5       asked you how you enforced that policy.

6           And should we go back and read your answer, or

7       do you want to have another shot at it?

8   A   I think what I said was that there was some

9       complementary technologies that work with the

10      firewall, and that's what it is.

11  Q   Okay.

12  MR. WHITE:                 And how hard is it to find

13      that?

14  COURT REPORTER (By reading):

15          Q   And how do you enforce the policy

16              that staff are not to use any of

17              your client computers to access

18              the Internet for personal

19              business?

20          A   Through security controls such as

21              the firewall and complementary

22              technologies that work in

23              conjunction with the firewall.

24  Q   MR. WHITE:            So then -- we do the same

25      thing.  On the Davis network, you can't go gamble

26      the afternoon away.

27          But let's talk about e-mail.  That isn't

```
 1        visiting a site.  That's sending an electronic
 2        message out onto the Internet.
 3   A    M-hm.
 4   Q    Are there restrictions on that?
 5   A    No.
 6   Q    And there is, therefore, nothing in place other
 7        than trust to prevent someone using a client
 8        computer to send confidential information by e-mail
 9        out into the Internet, is there?
10   MS. FINLAY:            How is that relevant?
11   MR. WHITE:             Because of what happened here.
12   MS. FINLAY:            What confidential information
13        are you alleging was --
14   MR. WHITE:             Any confidential patient
15        information.
16   MS. FINLAY:            I'm sorry, I don't see how
17        that's relevant to what's in here.
18   MR. WHITE:             I, you know, want to say in
19        the most polite and collegial way possible that
20        your not seeing it isn't the test.
21            What we have here so far is evidence from this
22        witness that on the 24th of November, 2007,
23        information went from Capital Health's network out
24        onto the Internet to a publically accessible web
25        site containing -- although only one word,
26        containing information that is descriptive of a
27        relationship between a patient and a doctor.  That
```

1        happened.

2   Q    How can that happen?

3   MS. FINLAY:              You haven't answered how

4        that's -- that's not confidential patient

5        information.

6   MR. WHITE:               How do you know that?

7   MS. FINLAY:              Well, you don't know it

8        either.  That's my point.  This line of questioning

9        seems to me to be unrelated to what we're actually

10       doing here.

11  MR. WHITE:               Fine.

12  Q    How is it possible -- for the second-last entry

13       relating to the 198 address, how is it possible for

14       that to get from the Capital Health network to a

15       publically accessible web site?

16  A    Our technical security controls do not categorize

17       RATEMDS in any of the categories that would cause

18       it to be restricted for access from internal to the

19       Capital Health network.

20  Q    And in this case, your IP address accessed a web

21       site.  There is no control whatsoever on the place

22       to which e-mail can be sent, is there?

23  A    No.

24  Q    Now, if you'll look again back at Exhibit E that

25       we've been talking about.  You've got it there.

26            Now, look at the very top.  On May 26th of

27       2007 at IP address 161, et cetera, which is

42

```
1        assigned to Telus Dial-Up?
2    A   Right.
3    Q   Has that IP address ever been used by Capital
4        Health?
5    A   That's an IP address that is assigned to Telus
6        Dial-Up and not Capital Health.
7    Q   And so the answer to my question is?
8    A   No.
9    Q   And the last one on that page, on April 20th, 2008,
10       IP address 154, et cetera, is assigned to the Telus
11       ADSL service.  Was that IP address ever used by
12       Capital Health's network?
13   A   As with the first one, no, not to my knowledge.
14   Q   I'm showing you, sir, a list of names:  Kenneth
15       Gardener, Neil Gibson, David Morris, Linda Scott,
16       Donna Canart.
17           Did any of those people have access to the
18       Capital Health network?
19   A   Yes.
20   Q   All of them?
21   A   I'd have to go back to the records, but I recognize
22       one name for sure.
23   Q   Who?
24   A   Kenneth Gardener.
25   Q   I think you said they all had access; is that
26       correct?
27   A   I'd have to go back to the records to verify the
```

```
 1        last four names on that list.
 2    Q   Okay.  I'm sorry, I was thinking.
 3    MR. WHITE:              When I first read the list of
 4        names, can you just read that back to me.
 5    COURT REPORTER (By reading):
 6            Q   I'm showing you, sir, a list of
 7                names:  Kenneth Gardener, Neil
 8                Gibson, David Morris, Linda
 9                Scott, Donna Canart.  Did any of
10                those people have access to the
11                Capital Health network?
12            A   Yes.
13            Q   All of them?
14            A   I'd have to go back to the
15                records, but I recognize one name
16                for sure.
17    Q   MR. WHITE:              When someone uses -- well,
18        used the Capital Health network by making use of a
19        client computer, was it necessary for the user to
20        identify himself or herself?
21    A   Yes.
22    Q   And using, I take it, a username and password?
23    A   Yes.
24    Q   Now, laptop computers are of course very portable.
25        They could be taken off site?
26    A   M-hm.
27    Q   Sorry?
```

44

| 1 | A | Yes, sorry. |
|---|---|---|

2  Q  And when a laptop computer was being used off site,
3     for example, could it be used without encountering
4     the Capital Health network firewall?

5  A  This might be a bit long of an answer.  If you took
6     the Capital Health laptop and plug it into your
7     home network at home, you could use that computer
8     to access any site independently of the Capital
9     Health network or Capital Health firewall.

10 Q  And while the laptop computer was connected to the
11    Capital Health network, of course, the operator can
12    download information from the network onto the
13    laptop's hard drive?

14 A  Sorry, can you repeat that?

15 Q  Yes.  A user of a laptop -- a Capital Health
16    network laptop being used within the Capital Health
17    network, the operator could download onto the
18    laptop's hard drive information from the Capital
19    Health network?

20 A  Just to be clear, you mean -- "operator," you mean
21    the person using the computer?

22 Q  Right.

23 A  Yes.

24 Q  And then by removing the laptop from the premises
25    would also be removing the information that had
26    been put onto the hard drive?

27 A  It would no longer be on the Capital Health

45

```
 1        network, yes.
 2   Q    Yes.  It would be on the laptop?
 3   A    Yes.
 4   Q    And does Capital Health have any way of tracking or
 5        identifying the usage of such a laptop off site
 6        when it's being used outside the network?
 7   A    No.
 8   Q    So that looking at Exhibit E and the first, second,
 9        third, and fifth IPs, there's no way, I take it,
10        you can tell whether those IPs were ever the IPs of
11        Capital Health laptops being used outside the
12        Capital Health network, is there?
13   A    We have -- no.
14   Q    So if so disposed, absolutely confidential patient
15        information can be downloaded to a Capital Health
16        laptop hard drive, the laptop taken off the
17        premises, logged onto the Internet, and that
18        information sent to the Internet large, right?
19   MS. FINLAY:              That's a purely hypothetical
20        question.
21   MR. WHITE:               No, it isn't.
22   MS. FINLAY:              Yes, it is.
23   MR. WHITE:               No, it isn't.
24   Q    In fact, sir, it's an ongoing problem, isn't it?
25   MS. FINLAY:              That is completely irrelevant,
26        and he's not answering that question.  This
27        proceeding is entirely unrelated to that, and he
```

— 46 —

```
 1          need not answer those questions.
 2    Q    MR. WHITE:           There's a thing called the
 3          rule in Brown v. Dunn.
 4    A    Called the what, sorry?
 5    Q    Sorry, it's called the rule in Brown v. Dunn.
 6          There's no reason you should know it, but when
 7          you're doing a cross-examination, it requires us to
 8          ask you things that -- ask you about things
 9          concerning which there may be contradictory
10          evidence.
11                And so I'm now going to -- I'm telling you
12          this so your lawyer will be aware that I'm now
13          doing my Brown v. Dunn obligations, and you should
14          not say anything until your lawyer tells you yes or
15          no that you should.
16                Did you have any policies in place concerning
17          the Capital Health network to prevent confidential
18          health information being downloaded to laptop hard
19          drives, those laptops being removed from the
20          Capital Health network, and that confidential
21          information being sent out onto the Internet
22          generally?
23                You just don't ever answer these now until
24          your lawyer says yes or no.
25    MS. FINLAY:            No, he's not answering that.
26    Q    MR. WHITE:            And that could happen though,
27          couldn't it?
```

47

```
 1   MS. FINLAY:            Don't answer that either.
 2   Q   MR. WHITE:          And were that to happen, you
 3       would have no way of knowing it, would you?
 4   MS. FINLAY:            Don't answer that either.
 5   Q   MR. WHITE:          But you should be able to
 6       prevent that being done, shouldn't you?
 7   MS. FINLAY:            Also don't answer that
 8       question.
 9   Q   MR. WHITE:          Has it ever happened?
10   MS. FINLAY:            Don't answer that question.
11       That's completely irrelevant.
12   MR. WHITE:            Well, whether it is or not,
13       I'm doing my Brown v. Dunn obligations; and I have
14       specifically cautioned the witness not to answer
15       until you say, and I've always held up my hand to
16       reinforce that.
17   MS. FINLAY:            And I'm taking the position
18       that this entire line of questioning is completely
19       irrelevant.
20   MR. WHITE:            Yes, but you see, if it turns
21       out to be relevant and I haven't done what I'm
22       obliged by Brown v. Dunn to do, then --
23   MS. FINLAY:            You also haven't established
24       the basis for the relevancy.
25   MR. WHITE:                -- even though it turns out
26       to be relevant, if I haven't done my Brown v. Dunn
27       obligations, I'm stuck.  You see, I can establish
```

48

1      relevance later.
2           What do you understand, please, to be my
3      obligation under Brown v. Dunn?
4   MS. FINLAY:            What I understand your
5      obligation to be is that in this examination, which
6      is an examination on an affidavit that is in a
7      Rule 209 application for third-party records, we
8      have provided you with an affidavit that relates to
9      Alberta Health Services' -- previously Capital
10     Health's -- ability to provide those records.
11          This line of questioning is entirely unrelated
12     to that, and if it is relevant, then you can tell
13     me how it's relevant, and perhaps I will consider
14     allowing him to answer that question.
15  MR. WHITE:            Yes.  What do you understand
16     my obligations to be under Brown v. Dunn?
17  MS. FINLAY:            I don't need to advise you of
18     your obligations under Brown v. Dunn.  Your
19     obligations under Brown v. Dunn may relate to
20     putting contradictory statements to this witness,
21     but it has -- this entire line of questioning, as I
22     previously said, is entirely unrelated, and you
23     have not told me how it is related.
24          It may be related to other matters, but this
25     application and this affidavit is limited to the
26     proceedings that you have brought --
27  MR. WHITE:            Well, but --

49

1   MS. FINLAY:                -- which is specifically for
2        third-party records.
3   MR. WHITE:                I'm now at a point where I
4        don't mind telling you.  You see, we have now
5        learned, Ms. Finlay, that on Mr. Sorochan's Exhibit
6        E, the first, second, and the fifth could have come
7        from a Capital Health laptop off site.
8   MS. FINLAY:                How have we learned that?
9        Isn't that your conclusion?
10  MR. WHITE:                No, it isn't.  It's a
11       conclusion which a Judge could draw.  What I
12       conclude is absolutely irrelevant, as is what you
13       conclude.
14  MS. FINLAY:                I agree.
15  MR. WHITE:                But given that the evidence is
16       now clear that while a laptop is on the network,
17       information can be downloaded onto the hard drive
18       of the laptop, the laptop can be removed from site,
19       the laptop can then be connected to the Internet
20       without any interaction with the Capital Health
21       firewall and have access to send and receive
22       information over the Internet without restriction;
23       succinctly put, your witness is unable to deny that
24       those postings came from Capital Health computers
25       by his own evidence.
26  MS. FINLAY:                Well, that may be your
27       submission, but I don't see how that's related to

---
50
---

```
1         the newspaper article that you thrust at my client.
2    MR. WHITE:              I didn't thrust it at him.  I
3         put it in front of him, and you told me it was
4         hypothetical, and I said it isn't hypothetical.
5              In fact, it is happening as we speak and is
6         notorious enough and sufficiently in the public
7         domain to be on the headlines of yesterday's
8         leading Edmonton newspaper.
9              So my point is that it is not hypothetical;
10        that indeed Capital Health laptops with
11        confidential information have been taken off site
12        and accessed -- and the Internet accessed by them.
13             It's not a hypothetical at all, and the Court
14        can take judicial notice of it.
15   Q    I think, sir, I'm almost finished.  Just let me
16        check.
17             Is there any provision for a person authorized
18        to use the Capital Health network to access the
19        network, say, from home from their own computer?
20             Example:  I can log onto the Davis network by
21        passing through the firewall by satisfying certain
22        requirements.  Can that be done?
23   A    To make sure I am clear, you're saying, Could
24        somebody access the Capital Health network from
25        their home computer and then -- yeah, that's what
26        you're asking me?
27   Q    Yes.
```

1    A    So, yes, that's possible.

2    Q    And then from within the network send information

3         back out onto the Internet, in which case it would

4         appear to have originated with Capital Health?

5    A    So again to be clear, somebody connects in from

6         their home computer, their home network; gets

7         access to the Capital Health network; and then

8         accesses something on the Internet while being --

9    Q    No, not "accesses," sends out.  For example, I at

10        home get through the Davis firewall by meeting all

11        of the criteria, and I write an e-mail, which I

12        send; and the person who receives it, it doesn't

13        look like it's come from my home computer.  It

14        looks like it's come -- as indeed it has -- from

15        the Davis network.

16             Can that happen with Capital Health?

17   A    Yes.

18   Q    And in that case, the IP address associated with

19        the outgoing message, would that be, as with the

20        others, the firewall IP address, or would it be

21        unique?

22   A    It would be the firewall address.

23   Q    Now, what record is there that IP 198.161.230.10

24        was the Capital Health firewall network IP address

25        on November 24th, 2007?

26   A    I'm not sure I can produce a single report that

27        says that.  I mean, I -- like, a single report.

52

```
 1        I'm not really sure what that question was asking.
 2    Q   Well, have you your affidavit?  Paragraph 5, the
 3        second sentence says:
 4              The IP address quoted above is the
 5              IP address of the Capital Health,
 6              now Alberta Health Services,
 7              firewall.
 8        How do you know?
 9    A   When I was provided the IP address, I asked our
10        network Operations team if they could identify what
11        that IP address was; and they said -- and they
12        provided that information to me.  It was knowledge
13        that they have.
14    Q   So it's on information and belief?  Someone has
15        told it to you, and you believe it?
16    A   I have no reason not to believe it.
17    Q   Well, perhaps not, but it isn't your personal
18        information; it's information that you have gotten
19        from someone else, and you've relied on it?
20    A   As I said before, I'm not responsible for the
21        operations, so, yes, I would have to confirm that
22        with the Operations people.
23    Q   So you have found that out from the Operations
24        people?
25    A   Yes.
26    MR. WHITE:              Ms. Finlay, why is it that the
27        affidavit does not say that this is on information
```

```
 1        and belief?
 2   MS. FINLAY:              If you want to go off the
 3        record, we can talk about that, but I'm not
 4        answering that question now.
 5   Q    MR. WHITE:            Well, paragraph 6 says:
 6               In January of 2008, all Internet
 7               logs that would have identified the
 8               computer IP address correlating to
 9               the firewall logs of Internet use
10               were deleted.
11        Who told you that?
12   A    I do know that out of personal knowledge because of
13        being involved in that, yes.
14   Q    Okay.  Now, in paragraph 10, you have said that you
15        have attempted to determine if it's possible to
16        confirm whether any of the individual named
17        defendants in the action accessed the web site in
18        question.
19               And I take it that you did that by making
20        inquiries and that you learned that you were not
21        able to confirm that; is that correct?
22   A    I did that by inquiries, yes.
23   Q    Pardon?
24   A    I did that by inquiries, yes.
25   Q    And so the information in paragraphs 11 and 12,
26        should I understand that that is information that
27        you have obtained as a result of your inquiries
```

54

1        from other people?

2    A   No, 11 is my own knowledge.

3    Q   Okay.  Thank you.

4    A   12, 12 was my knowledge that I got -- asked for

5        confirmation of that from other technical people.

6    Q   I'm sorry?

7    A   Sorry.  I -- I did ask for confirmation from other

8        technical people if there was other ways to get

9        that information.

10   Q   So you believe that to be the case, but you sought

11       confirmation as well?

12   A   Yes.

13   MS. FINLAY:              No, he also said that was from

14       my knowledge.

15   MR. WHITE:               Yes, he said.  That's what I

16       just --

17        Will you just read back what I just said,

18       please, and Ms. Finlay's comment?

19   COURT REPORTER (By reading):

20        Q   So you believe that to be the

21            case, but you sought confirmation

22            as well?

23        A   Yes.

24        MS. FINLAY:   No, he also said that

25            was from my knowledge.

26   MS. FINLAY:              So not his belief, but his

27       knowledge.  Thank you.

```
 1    Q    MR. WHITE:              You believed you knew it, but
 2         not to the point that you didn't want confirmation;
 3         and you sought the confirmation, and it turned out
 4         that your belief was correct, right?
 5    A    Yes.
 6    Q    This is Brown v. Dunn again.  Does Capital Health
 7         have a FOIP policy relating to your ability to
 8         track Internet traffic in and out of the Capital
 9         Health network?
10    MS. FINLAY:              Can you read back the
11         question, please?
12    COURT REPORTER (By reading):
13              Q    This is Brown v. Dunn again.
14                   Does Capital Health have a FOIP
15                   policy relating to your ability
16                   to track Internet traffic in and
17                   out of the Capital Health
18                   network?
19    MS. FINLAY:              This witness is not here to
20         discuss their FOIP policy.  I think he already told
21         you that he didn't -- wasn't aware of it and didn't
22         have knowledge of all their FOIP policies.  He
23         doesn't administer those.
24    Q    MR. WHITE:              At paragraph 5 of your
25         affidavit, sir, the sentence ends "at this time."
26         What does that qualification mean, "at this time"?
27    A    Paragraph 5, sorry?
```

56

```
 1   Q   Yes.  Should I understand that Capital Health could
 2       do it at some -- could have done it at some time?
 3   A   Sorry, paragraph 5 doesn't end in --
 4   Q   Yes, it does.
 5   MS. FINLAY:              Just give me a minute, please.
 6       It's this sentence that he's referring to.
 7   A   What was your question again, please?
 8   Q   MR. WHITE:              Should I understand from that,
 9       however, that at some time it would have been able
10       to?
11   A   Yes.
12   Q   And that time was prior to the destruction of the
13       logs?
14   A   Yes.
15   Q   Yes.
16   MR. WHITE:              Thank you, sir.  I appreciate
17       you coming.
18   ----------------------------------------------------------
19              PROCEEDINGS ADJOURNED AT 1:19 P.M.
20                 SUBJECT TO THE UNDERTAKINGS
21   ----------------------------------------------------------
22
23
24
25
26
27
```

57

1  **CERTIFICATE OF TRANSCRIPT**

2

3

4

5          I, the undersigned, hereby certify that the

6  foregoing pages are a true and faithful transcript

7  of the proceedings taken down by me in shorthand and

8  transcribed from my shorthand notes to the best of my

9  skill and ability.

10          Dated at the City of Edmonton, Province of

11  Alberta, this 29th day of June, 2009.

12

13

14

15

16

J. Weigl, CSR(A), RPR, CRR
Official Court Reporter

*1*

| 0 | 3 | | | |
|---|---|---|---|---|
| 0803-04506 [1] - 1:6 | 3 [1] - 2:14 | 32:13, 32:17, 33:16, 36:26, 38:19<br>accountabilities [1] - 11:24<br>acknowledge [1] - 3:12<br>action [2] - 3:27, 53:17<br>activities [1] - 38:17<br>activity [3] - 20:10, 32:14, 39:4<br>acute [2] - 29:1, 29:8<br>acute-care [2] - 29:1, 29:8<br>addition [1] - 31:5<br>address [62] - 6:12, 9:1, 9:3, 9:6, 9:8, 9:9, 9:11, 9:13, 9:16, 10:18, 10:20, 20:2, 20:16, 20:19, 20:22, 20:26, 22:8, 24:2, 24:4, 24:6, 24:7, 24:15, 24:14, 24:21, 24:26, 24:27, 25:3, 25:6, 25:11, 25:12, 27:7, 27:8, 27:10, 27:16, 28:13, 31:19, 31:20, 33:25, 34:3, 35:21, 36:5, 36:6, 37:11, 41:13, 41:20, 41:27, 42:3, 42:5, 42:10, 42:11, 51:18, 51:20, 51:22, 51:24, 52:4, 52:5, 52:9, 52:11, 53:8<br>addresses [7] - 10:17, 21:8, 21:16, 24:19, 27:9, 27:13, 27:25<br>adequacy [1] - 14:25<br>adequate [1] - 17:17<br>ADJOURNED [1] - 56:19<br>administer [2] - 30:9, 55:23<br>administered [1] - 27:19, 28:10<br>administrative [1] - 13:20<br>admitted [1] - 6:2<br>ADSL [1] - 42:11<br>advise [1] - 48:17<br>advisement [1] - 17:4<br>AFFIDAVIT [5] - 1:35, 2:14, 2:18, 3:24, 4:7<br>affidavit [19] - 3:13, 3:21, 3:26, 4:4, 4:22, 4:25, 6:3, 6:15, 6:16, | 6:25, 7:1, 33:27, 34:2, 48:6, 48:8, 48:25, 52:2, 52:27, 55:25<br>afternoon [1] - 39:26<br>agree [2] - 4:11, 49:14<br>agreed [1] - 33:25<br>agreement [1] - 24:13<br>AHS [1] - 18:19<br>ALBERTA [1] - 1:1<br>Alberta [14] - 1:51, 1:58, 11:8, 11:17, 11:21, 12:8, 12:12, 12:21, 14:17, 15:23, 37:22, 48:9, 52:6, 57:11<br>algorithms [1] - 34:19<br>alleging [1] - 40:13<br>allocated [1] - 35:3<br>allow - 34:20<br>allowing [1] - 48:14<br>almost [1] - 50:15<br>alternative [1] - 26:19<br>amended [2] - 14:14, 14:17<br>amendment [1] - 5:12<br>amount [1] - 7:14<br>announced [1] - 15:23<br>answer [22] - 4:12, 5:14, 9:4, 15:4, 15:7, 17:6, 17:13, 27:27, 33:5, 38:14, 39:6, 42:7, 44:5, 46:1, 46:23, 47:1, 47:4, 47:7, 47:10, 47:14, 48:14<br>answered [1] - 41:3<br>answering [3] - 45:26, 46:25, 53:4<br>anyway [1] - 22:26<br>appear [4] - 9:1, 10:17, 10:27, 51:4<br>application [2] - 48:7, 48:25<br>applied [1] - 30:3<br>appreciate [1] - 56:16<br>appropriate [1] - 13:1<br>April [1] - 42:9<br>article [1] - 50:1<br>assign [1] - 20:26<br>assigned [5] - 31:21, 33:26, 42:1, 42:5, 42:10 | assistance [2] - 7:25, 8:8<br>associated [1] - 51:18<br>assure [2] - 3:14, 16:26<br>AT [2] - 3:1, 56:19<br>attempted [1] - 53:15<br>audits [1] - 18:13<br>authorize [2] - 32:6, 32:11<br>authorized [2] - 32:9, 50:17<br>authorizes [1] - 32:2<br>automatically [1] - 24:24<br>available [1] - 27:13<br>aware [4] - 4:24, 29:14, 46:12, 55:21 |
| **1** | **4** | | | |
| 1 [6] - 5:13, 8:18, 8:22, 21:17, 22:5, 22:6<br>10 [1] - 53:14<br>11 [2] - 53:25, 54:2<br>11:39 [1] - 3:1<br>12 [3] - 53:25, 54:4<br>12:55 [1] - 21:18<br>15 [1] - 12:23<br>154 [1] - 42:10<br>16 [2] - 12:23, 19:14<br>16,000 [6] - 19:16, 20:1, 20:20, 28:23, 32:6, 32:17<br>161 [1] - 41:27<br>18,000 [2] - 18:22, 18:23<br>19 [3] - 2:19, 4:4, 4:7<br>198 [11] - 35:3, 35:6, 35:9, 35:10, 35:14, 35:21, 35:23, 36:1, 36:3, 36:9, 41:13<br>198.161.230.10 [3] - 33:25, 34:4, 51:23<br>1:05 [1] - 21:18<br>1:19 [1] - 56:19 | 4 [1] - 2:18 | | | **B** |
| | **5** | | | backtracking [1] - 35:22<br>backwards [1] - 36:1<br>banking [1] - 33:13<br>based [4] - 8:12, 22:7, 28:15, 32:14<br>basis [1] - 47:24<br>become [1] - 16:27<br>behaviors [2] - 32:11, 32:12<br>belief [4] - 52:14, 53:1, 54:26, 55:4<br>BENCH [1] - 1:1<br>best [1] - 57:8<br>betting [1] - 38:26<br>between [2] - 10:2, 40:27<br>BETWEEN [1] - 1:10<br>bigger [1] - 12:3, 12:5<br>binary [3] - 26:6, 26:14, 26:19<br>bit [4] - 15:15, 15:16, 16:18, 44:5<br>bottom [1] - 31:13<br>bounces [1] - 34:17<br>bounds [1] - 16:23<br>break [1] - 13:6<br>bright [1] - 22:21<br>broad [1] - 15:5<br>broadened [1] - 12:13<br>broadly [1] - 16:21<br>broken [1] - 14:8<br>brought [1] - 48:26<br>Brown [12] - 46:3, 46:5, 46:13, 47:13, |
| | 5 [6] - 22:5, 22:6, 52:2, 55:24, 55:27, 56:3 | | | |
| | **6** | | | |
| | 6 [1] - 53:5 | | | |
| **2** | **A** | | | |
| 2 [1] - 5:11<br>20 [1] - 7:1<br>2007 [6] - 7:4, 7:8, 31:17, 31:25, 36:15, 40:22, 41:27, 51:25<br>2008 [3] - 36:11, 42:9, 53:6<br>2009 [10] - 1:36, 1:59, 2:15, 2:19, 3:22, 3:24, 4:1, 4:5, 4:8, 57:11<br>209 [1] - 48:7<br>20th [1] - 42:9<br>22 [4] - 1:36, 2:15, 3:21, 3:24<br>24th [5] - 3:27, 31:17, 31:25, 40:22, 51:25<br>26 [1] - 1:59<br>26th [1] - 41:26<br>29th [1] - 57:11 | A.M [1] - 3:1<br>ability [4] - 48:10, 55:7, 55:15, 57:9<br>able [9] - 9:7, 9:9, 16:21, 22:7, 27:5, 37:10, 47:5, 53:21, 56:9<br>absolutely [6] - 10:9, 11:27, 16:6, 37:10, 45:14, 49:12<br>acceptable [1] - 32:19<br>access [49] - 9:15, 19:5, 23:17, 23:19, 23:26, 24:6, 24:7, 25:10, 25:14, 25:18, 25:20, 25:22, 26:3, 26:9, 26:20, 26:21, 26:22, 26:23, 26:24, 27:1, 28:11, 28:17, 28:24, 29:2, 29:3, 29:5, 30:13, 31:6, 33:11, 33:13, 33:20, 36:16, 37:27, 38:3, 38:8, 38:11, 38:15, 38:22, 38:24, 39:17, 41:18, 42:17, 42:25, 43:10, 44:8, 49:21, 50:18, 50:24, 51:7<br>accessed [7] - 9:2, 29:15, 29:18, 41:20, 50:12, 53:17<br>accesses [2] - 51:8, 51:9<br>accessible [2] - 40:24, 41:15<br>accessing [5] - | | | |

— 2 —

47:22, 47:26, 48:3,
48:16, 48:18, 48:19,
55:6, 55:13
  **building** [1] - 12:4
  **built** [1] - 34:16
  **business** [11] - 14:4,
21:4, 29:22, 32:21,
33:1, 33:4, 33:7,
33:11, 33:12, 33:21,
39:19
  **BY** [1] - 3:1

---

**C**

  **California** [1] - 4:26
  **Canart** [2] - 42:16,
43:9
  **candidly** [1] - 14:7
  **cannot** [4] - 6:20,
22:2, 23:26, 33:27
  **Capital** [92] - 7:7,
11:10, 11:12, 11:15,
11:20, 12:10, 12:12,
14:15, 17:16, 17:18,
17:19, 17:22, 18:15,
18:19, 19:3, 19:5,
19:11, 19:13, 19:21,
19:22, 20:3, 20:9,
21:6, 21:11, 22:10,
22:19, 22:23, 22:25,
22:27, 23:13, 23:16,
25:15, 25:27, 27:11,
29:16, 29:19, 29:22,
30:11, 30:14, 30:22,
31:7, 31:21, 31:25,
31:26, 32:1, 32:5,
33:26, 37:16, 37:21,
37:23, 38:8, 40:23,
41:14, 41:19, 42:3,
42:6, 42:12, 42:18,
43:11, 43:18, 44:4,
44:6, 44:8, 44:9,
44:11, 44:15, 44:16,
44:18, 44:27, 45:4,
45:11, 45:12, 45:15,
46:17, 46:20, 48:9,
49:7, 49:20, 49:24,
50:10, 50:18, 50:24,
51:4, 51:7, 51:16,
51:24, 52:5, 55:6,
55:8, 55:14, 55:17,
56:1
  **care** [2] - 29:1, 29:8
  **case** [8] - 32:8, 37:2,
38:10, 41:20, 51:3,
51:18, 54:10, 54:21
  **cases** [1] - 10:16
  **categories** [2] -
38:23, 41:17
  **categorize** [1] -

41:16
  **category** [2] - 38:19,
38:23
  **causing** [1] - 21:14
  **cautioned** [1] - 47:14
  **ceasing** [1] - 11:20
  **certain** [7] - 5:4,
6:20, 21:4, 23:21,
23:26, 37:8, 50:21
  **certainly** [4] - 5:16,
7:18, 13:12, 16:25
  **CERTIFICATE** [1] -
57:1
  **certifications** [1] -
12:24
  **certify** [1] - 57:5
  **cetera** [3] - 35:3,
41:27, 42:10
  **change** [5] - 12:12,
15:19, 24:17, 24:27,
27:9
  **changed** [6] - 3:17,
11:19, 11:25, 12:13,
21:16, 22:4, 22:21,
24:24
  **changes** [3] - 24:4,
24:15, 27:8
  **changing** [1] - 21:3
  **characterize** [2] -
32:27, 33:3
  **check** [1] - 50:16
  **children** [1] - 29:1
  **City** [1] - 57:10
  **clean** [1] - 3:9
  **cleaner** [1] - 15:17
  **clear** [8] - 16:27,
17:8, 35:19, 38:10,
44:20, 49:16, 50:23,
51:5
  **client** [14] - 7:14,
18:16, 32:7, 33:20,
36:1, 36:26, 37:7,
37:17, 37:23, 38:22,
39:17, 40:7, 43:19,
50:1
  **clients** [1] - 19:21
  **clinical** [1] - 29:23
  **clusters** [1] - 8:24
  **coincidence** [1] -
25:12
  **coincidental** [3] -
25:2, 25:4, 25:5
  **collegial** [1] - 40:19
  **column** [2] - 8:19,
8:22
  **coming** [2] - 3:4,
56:17
  **commanded** [1] - 5:3
  **commencement** [1]
- 3:7

  **comment** [2] - 31:19,
54:18
  **comments** [2] - 7:4,
39:4
  **complementary** [3] -
33:23, 39:9, 39:21
  **completely** [4] -
22:4, 45:25, 47:11,
47:18
  **compliance** [5] -
18:4, 18:5, 18:9,
21:27, 22:1
  **computer** [55] - 9:3,
9:10, 9:11, 9:14, 9:15,
9:17, 10:19, 10:20,
12:6, 19:26, 20:11,
20:15, 20:18, 20:21,
20:27, 21:2, 21:14,
21:17, 21:19, 22:2,
22:4, 22:7, 24:5, 25:2,
25:6, 25:9, 25:19,
26:24, 27:1, 27:6,
27:24, 28:12, 28:16,
29:2, 34:1, 34:6, 34:8,
34:10, 34:11, 36:2,
36:8, 37:24, 40:8,
43:19, 44:2, 44:7,
44:10, 44:21, 50:19,
50:25, 51:6, 51:13,
53:8
  **computer's** [2] -
24:27, 25:13
  **computers** [36] - 9:2,
10:26, 11:1, 18:17,
18:23, 19:13, 19:17,
19:20, 20:1, 20:20,
23:16, 23:21, 23:24,
23:26, 24:1, 25:21,
25:24, 27:15, 28:23,
28:27, 29:7, 29:20,
32:7, 32:17, 32:22,
33:20, 34:27, 36:26,
37:8, 37:17, 37:27,
38:7, 38:15, 39:17,
43:24, 49:24
  **concerning** [2] -
46:9, 46:16
  **conclude** [6] - 14:27,
16:7, 17:1, 25:19,
49:12, 49:13
  **conclusion** [2] -
49:9, 49:11
  **conclusions** [1] -
16:11
  **confidential** [10] -
30:1, 30:26, 40:8,
40:12, 40:14, 41:4,
45:14, 46:17, 46:20,
50:11
  **configuration** [1] -

22:5
  **configure** [1] - 10:23
  **configured** [2] -
10:16, 25:18
  **confirm** [3] - 52:21,
53:16, 53:21
  **confirmation** [6] -
54:5, 54:7, 54:11,
54:21, 55:2, 55:3
  **confused** [1] - 19:9
  **conjunction** [2] -
33:23, 39:23
  **connect** [2] - 19:22,
34:5, 34:7
  **connected** [8] - 27:3,
27:6, 27:15, 27:24,
28:12, 31:25, 44:10,
49:19
  **connectible** [1] -
19:2
  **connection** [3] -
23:5, 23:9, 33:15
  **connects** [1] - 51:5
  **consider** [3] - 15:10,
15:13, 48:13
  **consisted** [1] - 29:17
  **consists** [1] - 8:23
  **constraints** [2] -
15:20, 15:27
  **containing** [2] -
40:25, 40:26
  **context** [1] - 12:9
  **contracted** [1] -
18:12
  **contradictory** [2] -
46:9, 48:20
  **control** [1] - 41:21
  **controls** [5] - 12:19,
13:20, 33:22, 39:20,
41:16
  **copy** [3] - 3:8, 3:13,
3:26
  **corners** [1] - 6:15
  **CORPORATION** [1] -
1:13
  **correct** [14] - 5:1,
5:4, 11:2, 14:22,
17:27, 19:18, 19:19,
26:25, 28:21, 30:25,
31:8, 42:26, 53:21,
55:4
  **correlating** [1] - 53:8
  **counsel** [2] - 3:10,
24:12
  **course** [6] - 6:1,
14:23, 22:22, 34:27,
43:24, 44:11
  **COURT** [7] - 1:1, 8:2,
24:12, 39:14, 43:5,
54:19, 55:12

  **Court** [6] - 1:54,
4:25, 5:3, 8:18, 50:13,
57:22
  **Courts** [1] - 3:11
  **covers** [1] - 30:17
  **created** [1] - 36:17
  **criminal** [3] - 32:14,
38:17, 39:4
  **criteria** [1] - 51:11
  **cross** [5] - 6:14,
6:24, 14:6, 17:5, 46:7
  **CROSS** [1] - 1:35,
3:1
  **cross-examination**
[5] - 6:14, 6:24, 14:6,
17:5, 46:7
  **CROSS-**
**EXAMINATION** [1] -
1:35
  **CROSS-EXAMINED**
[1] - 3:1
  **CRR** [1] - 1:54, 57:21
  **CSR(A** [2] - 1:54,
57:21
  **current** [1] - 14:15

---

**D**

  **D-1** [3] - 2:14, 3:20,
3:23
  **D-2** [5] - 2:18, 4:3,
4:6, 4:9, 31:11
  **data** [11] - 12:20,
29:21, 30:13, 32:10,
34:17, 34:19, 34:20,
35:13, 35:22, 36:3
  **dated** [1] - 31:16
  **Dated** [1] - 57:10
  **David** [2] - 42:15,
43:8
  **Davis** [4] - 39:25,
50:20, 51:10, 51:15
  **days** [3] - 24:20,
24:25, 24:26
  **deal** [2] - 13:18,
27:21
  **deals** [1] - 6:16
  **December** [1] - 7:8
  **decommissioned** [3]
- 36:16, 36:19, 37:6
  **defendants** [1] -
53:17
  **Defendants** [1] -
1:25
  **deficient** [1] - 15:13
  **defined** [2] - 14:9,
33:8
  **definitively** [1] -
37:10

3

**degree** [3] - 4:15, 12:23, 28:22
**deleted** [1] - 53:10
**deliberate** [1] - 25:1
**deny** [1] - 49:23
**derived** [1] - 6:27
**describe** [1] - 32:8
**described** [1] - 31:27
**description** [1] - 11:19
**DESCRIPTION** [1] - 2:11
**descriptive** [1] - 40:26
**design** [1] - 25:15
**designated** [1] - 8:20
**designed** [1] - 33:10
**desktop** [4] - 18:23, 18:24, 19:17, 19:20
**destination** [2] - 36:6
**destruction** [1] - 56:12
**detail** [2] - 15:26, 27:22
**detailed** [1] - 9:4
**determination** [1] - 6:22
**determine** [3] - 14:25, 22:2, 53:15
**determines** [1] - 34:19
**developed** [1] - 14:21
**developer** [1] - 7:17
**device** [2] - 10:1, 36:11
**Dial** [2] - 42:1, 42:6
**Dial-Up** [2] - 42:1, 42:6
**different** [6] - 10:21, 14:13, 22:17, 24:21, 25:25
**difficult** [1] - 21:2
**disagree** [2] - 4:16, 4:17
**disagreement** [1] - 4:16
**discovery** [1] - 17:7
**discuss** [1] - 55:20
**DISCUSSION** [1] - 9:26
**disposed** [1] - 45:14
**DISTRICT** [1] - 1:2
**District** [3] - 4:25, 4:26, 8:18
**division** [1] - 4:27
**doctor** [2] - 32:9, 40:27
**document** [2] - 5:13, 5:26

**documents** [5] - 5:4, 5:8, 5:18, 5:19, 5:21
**DOE** [2] - 1:22
**domain** [1] - 50:7
**done** [6] - 17:24, 47:6, 47:21, 47:26, 50:22, 56:2
**Donna** [2] - 42:16, 43:9
**down** [2] - 22:7, 57:7
**download** [2] - 44:12, 44:17
**downloaded** [3] - 45:15, 46:18, 49:17
**dozen** [1] - 28:25
**Dr** [1] - 23:21
**draw** [1] - 49:11
**drive** [5] - 44:13, 44:18, 44:26, 45:16, 49:17
**drives** [1] - 46:19
**drop** [1] - 29:4
**due** [1] - 15:20
**Dunn** [12] - 46:3, 46:5, 46:13, 47:13, 47:22, 47:26, 48:3, 48:16, 48:18, 48:19, 55:6, 55:13

**E**

**e-mail** [10] - 33:13, 33:16, 33:17, 37:18, 37:22, 39:27, 40:8, 41:22, 51:11
**easier** [1] - 17:13
**easy** [2] - 32:23, 32:24
**EDMONTON** [1] - 1:2
**Edmonton** [3] - 1:58, 50:8, 57:10
**effort** [1] - 15:25
**either** [6] - 17:6, 23:8, 26:8, 41:8, 47:1, 47:4
**electronic** [1] - 40:1
**employed** [1] - 11:7
**encountering** [1] - 44:3
**end** [3] - 18:16, 25:1, 56:3
**endeavoring** [1] - 4:14
**ends** [1] - 55:25
**enforce** [3] - 33:19, 36:25, 39:15
**enforced** [1] - 39:5
**engineering** [1] - 12:23

**ensure** [3] - 21:26, 24:5, 25:13
**entire** [2] - 47:18, 48:21
**entirely** [4] - 17:20, 45:27, 48:11, 48:22
**entitled** [1] - 30:14
**entries** [2] - 5:23, 6:20
**entry** [3] - 31:16, 32:26, 41:12
**equipment** [1] - 13:2
**essentially** [1] - 34:10
**establish** [5] - 4:15, 13:15, 13:18, 13:22, 47:27
**established** [7] - 14:1, 14:10, 14:11, 14:12, 14:13, 14:16, 47:23
**establishes** [1] - 14:9
**establishment** [1] - 12:27
**et** [3] - 35:3, 41:27, 42:10
**evidence** [9] - 6:11, 16:19, 16:22, 24:14, 40:21, 46:10, 49:15, 49:25
**evil** [1] - 37:20
**exactly** [4] - 16:18, 29:12, 32:3, 57:21
**examination** [7] - 6:14, 6:24, 14:6, 17:5, 46:7, 48:5, 48:6
**EXAMINATION** [1] - 1:35
**EXAMINED** [1] - 3:1
**example** [5] - 10:3, 10:19, 44:3, 50:20, 51:9
**except** [2] - 37:19, 37:24
**Exhibit** [10] - 3:20, 4:3, 4:9, 31:11, 31:14, 32:27, 35:17, 41:24, 45:8, 49:5
**EXHIBIT** [2] - 3:23, 4:6
**EXHIBITS** [1] - 2:7
**expend** [1] - 15:25
**experience** [1] - 12:24
**experienced** [1] - 21:17
**experiencing** [1] - 21:10
**expert** [1] - 7:16

**external** [3] - 10:18, 18:12, 34:3
**externally** [1] - 18:12

**F**

**facilities** [2] - 29:1, 29:8
**fact** [2] - 45:24, 50:5
**fair** [6] - 7:14, 33:18, 35:2, 35:8, 36:13, 37:1
**faithful** [1] - 57:6
**familiar** [1] - 18:18
**far** [1] - 40:21
**February** [2] - 3:27, 4:4
**FEBRUARY** [2] - 2:19, 4:7
**few** [1] - 28:25
**fifth** [2] - 45:9, 49:6
**filed** [2] - 3:10, 3:27
**filtering** [1] - 38:3
**fine** [1] - 41:11
**finished** [1] - 50:15
**FINLAY** [67] - 3:15, 4:12, 4:21, 5:14, 5:24, 6:2, 6:6, 6:10, 7:3, 7:6, 9:20, 9:24, 13:6, 13:9, 13:23, 13:27, 15:4, 15:8, 16:9, 16:13, 16:17, 17:3, 21:22, 21:25, 22:14, 22:18, 24:9, 24:14, 24:18, 26:10, 30:3, 30:8, 30:16, 30:20, 32:3, 33:2, 33:5, 33:8, 38:14, 40:10, 40:12, 40:16, 41:3, 41:7, 45:19, 45:22, 45:25, 46:25, 47:1, 47:4, 47:7, 47:10, 47:17, 47:23, 48:4, 48:17, 49:1, 49:8, 49:14, 49:26, 53:2, 54:13, 54:24, 54:26, 55:10, 55:19, 56:5
**Finlay** [3] - 1:51, 49:5, 52:26
**Finlay's** [1] - 54:18
**firewall** [38] - 9:27, 10:5, 10:13, 10:16, 10:23, 22:12, 23:2, 23:11, 31:9, 33:22, 33:24, 34:3, 34:4, 34:7, 34:12, 34:17, 34:18, 35:4, 35:21, 35:25, 36:4, 36:11, 36:14, 36:17, 39:10,

39:21, 39:23, 44:4, 44:9, 49:21, 50:21, 51:10, 51:20, 51:22, 51:24, 52:7, 53:9
**first** [4] - 42:13, 43:3, 45:8, 49:6
**Foda** [1] - 31:27
**FODA** [2] - 1:13
**FOIP** [8] - 30:4, 30:9, 30:17, 30:19, 55:7, 55:14, 55:20, 55:22
**foregoing** [1] - 57:6
**form** [1] - 4:19
**formation** [1] - 14:17
**four** [2] - 6:15, 43:1
**frame** [1] - 22:15
**front** [2] - 31:11, 50:3
**function** [4] - 10:13, 12:26, 31:9, 32:1
**functions** [1] - 32:14

**G**

**gain** [1] - 28:17
**gamble** [1] - 39:25
**gambling** [2] - 38:27, 39:3
**Gardener** [3] - 42:15, 42:24, 43:7
**gateway** [2] - 23:10, 23:11
**generally** [1] - 46:22
**generic** [3] - 9:21, 9:23, 21:5
**generically** [4] - 8:26, 8:27, 21:12, 26:18
**Gibson** [2] - 42:15, 43:8
**given** [17] - 9:11, 9:14, 16:20, 19:21, 22:1, 24:4, 25:6, 26:3, 26:27, 27:6, 27:12, 27:15, 27:23, 28:16, 34:6, 34:8, 49:15
**governance** [1] - 18:5
**governing** [2] - 28:6, 28:9
**great** [1] - 15:26
**group** [2] - 27:21, 30:9
**guess** [1] - 16:17

**H**

**hand** [1] - 47:15
**hands** [1] - 17:24

4

**hands-on** [1] - 17:24
**hard** [9] - 13:13, 32:25, 39:12, 44:13, 44:18, 44:26, 45:16, 46:18, 49:17
**hardware** [4] - 13:3, 13:4, 18:16, 34:25
**hate** [2] - 32:14, 38:25
**hate-based** [1] - 32:14
**head** [1] - 26:2
**heading** [1] - 5:12
**headlines** [1] - 50:7
**Health** [101] - 1:51, 7:7, 11:8, 11:10, 11:12, 11:15, 11:17, 11:20, 11:22, 12:8, 12:10, 12:12, 12:13, 12:21, 14:15, 14:17, 15:23, 17:16, 17:18, 18:19, 19:3, 19:5, 19:11, 19:14, 19:21, 19:22, 20:3, 20:9, 21:6, 21:11, 22:10, 22:19, 22:23, 22:25, 22:27, 23:13, 23:17, 25:15, 25:27, 27:11, 29:16, 29:19, 29:22, 31:7, 31:21, 31:25, 31:27, 32:1, 32:5, 33:26, 37:16, 37:21, 37:22, 37:23, 38:8, 41:14, 41:19, 42:4, 42:6, 42:18, 43:11, 43:18, 44:4, 44:6, 44:9, 44:11, 44:15, 44:16, 44:19, 44:27, 45:4, 45:11, 45:12, 45:15, 46:17, 46:20, 48:9, 49:7, 49:20, 49:24, 50:10, 50:18, 50:24, 51:4, 51:7, 51:16, 51:24, 52:5, 52:6, 55:6, 55:9, 55:14, 55:17, 56:1
**health** [1] - 46:18
**Health's** [3] - 40:23, 42:12, 48:10
**hear** [2] - 11:14, 24:23
**held** [1] - 47:15
**help** [1] - 3:12
**hereby** [1] - 57:5
**herself** [1] - 43:20
**hesitant** [1] - 15:17
**hesitating** [1] - 18:16
**himself** [1] - 43:20

**history** [1] - 20:17
**hm** [6] - 19:1, 19:12, 23:3, 29:25, 40:3, 43:26
**home** [14] - 9:6, 9:7, 10:4, 10:7, 33:14, 44:7, 50:19, 50:25, 51:6, 51:10, 51:13
**hope** [1] - 12:6
**horses** [1] - 30:27
**hundred** [1] - 19:14
**hypothetical** [5] - 45:19, 50:4, 50:9, 50:13

**I**

**identified** [3] - 24:1, 25:10, 53:7
**identify** [6] - 5:8, 5:9, 5:21, 6:20, 43:20, 52:10
**identifying** [1] - 45:5
**identity** [1] - 6:22
**implementation** [1] - 13:4
**implemented** [2] - 27:20, 31:9
**imply** [1] - 4:20
**import** [2] - 5:6, 5:17
**imposes** [1] - 37:13
**IN** [1] - 1:1
**inadequate** [1] - 15:11
**inc** [1] - 4:27
**include** [1] - 33:17
**including** [1] - 29:24
**incoming** [1] - 34:18
**indeed** [2] - 50:10, 51:14
**independently** [1] - 44:8
**INDEX** [2] - 2:3, 2:7
**indicated** [2] - 7:6, 38:2
**individual** [2] - 5:22, 53:16
**individuals** [2] - 5:10, 5:22
**industry** [2] - 12:24, 18:5
**ineffective** [1] - 20:25
**inefficient** [1] - 20:26
**inelegantly** [1] - 19:8
**information** [45] - 6:21, 7:24, 7:25, 8:6, 8:9, 8:13, 10:6, 10:14, 10:24, 12:19, 12:20,

13:19, 21:13, 29:15, 29:18, 29:24, 30:1, 30:23, 30:26, 31:24, 40:8, 40:12, 40:15, 40:23, 40:26, 41:5, 44:12, 44:18, 44:25, 45:15, 45:18, 46:18, 46:21, 49:17, 49:22, 50:11, 51:2, 52:12, 52:14, 52:18, 52:27, 53:25, 53:26, 54:9
**inquiries** [4] - 53:20, 53:22, 53:24, 53:27
**interaction** [1] - 49:20
**interest** [1] - 6:9
**interested** [1] - 8:19
**interface** [3] - 22:10, 22:23, 22:27
**internal** [1] - 16:17, 18:12, 20:3, 29:22, 36:5, 41:18
**internally** [1] - 20:9
**internet** [1] - 10:10
**internet** [60] - 10:12, 10:25, 22:11, 22:24, 23:1, 23:6, 23:14, 23:17, 23:19, 23:26, 24:6, 24:8, 25:10, 25:14, 25:18, 25:20, 25:23, 26:4, 26:9, 26:20, 26:21, 27:1, 28:12, 28:17, 28:24, 29:3, 29:5, 29:9, 32:7, 32:17, 32:20, 32:21, 33:11, 33:15, 33:21, 36:26, 37:12, 37:18, 38:1, 38:9, 38:11, 38:15, 38:20, 38:22, 39:18, 40:2, 40:9, 40:24, 45:17, 45:18, 46:21, 49:19, 49:22, 50:12, 51:3, 51:8, 53:6, 53:9, 55:8, 55:16
**intrinsically** [1] - 34:25
**involved** [1] - 53:13
**IP** [79] - 6:11, 8:20, 8:22, 9:1, 9:3, 9:8, 9:11, 9:13, 9:16, 10:17, 10:18, 10:19, 10:20, 20:1, 20:16, 20:18, 20:21, 20:26, 21:8, 21:16, 22:7, 24:2, 24:4, 24:6, 24:7, 24:15, 24:16, 24:19, 24:21, 24:26, 24:27, 25:2, 25:6, 25:10, 25:12, 27:7, 27:8,

27:9, 27:10, 27:13, 27:16, 27:25, 28:13, 31:19, 31:20, 31:25, 33:25, 34:2, 34:3, 35:3, 35:6, 35:7, 35:9, 35:10, 35:14, 35:22, 35:23, 36:1, 36:3, 36:5, 36:6, 36:9, 37:11, 41:20, 41:27, 42:3, 42:5, 42:10, 42:11, 51:18, 51:20, 51:23, 51:24, 52:4, 52:5, 52:9, 52:11, 53:8
**IPs** [1] - 45:9, 45:10
**irrelevant** [4] - 45:25, 47:1, 47:19, 49:12
**isolate** [1] - 10:17
**issue** [2] - 6:17, 6:18, 21:18
**issued** [1] - 4:27
**issues** [2] - 16:19, 21:12

**J**

**JANE** [1] - 1:22
**January** [2] - 36:10, 53:6
**job** [4] - 11:19, 11:23, 12:1, 12:7
**JOHN** [1] - 1:22
**joined** [1] - 12:9
**Jose** [1] - 4:26
**judge** [1] - 49:11
**JUDICIAL** [1] - 1:2
**judicial** [1] - 50:14
**June** [2] - 1:59, 57:11

**K**

**keep** [10] - 10:6, 20:6, 20:15, 21:8, 24:21, 30:27, 33:10, 36:20, 36:23, 36:27
**keeping** [1] - 10:14
**Kenneth** [3] - 42:14, 42:24, 43:7
**kept** [2] - 20:16, 29:15
**kids** [2] - 29:6, 29:7
**kind** [2] - 14:9, 21:23
**knowing** [2] - 27:2, 47:3
**knowledge** [10] - 28:15, 42:13, 52:12, 53:12, 54:2, 54:4, 54:14, 54:25, 54:27,

55:22
**knows** [3] - 6:8, 7:19, 7:20

**L**

**laptop** [21] - 18:24, 18:25, 19:18, 19:20, 43:24, 44:2, 44:6, 44:10, 44:15, 44:16, 44:24, 45:2, 45:5, 45:16, 46:18, 49:7, 49:16, 49:18, 49:19
**laptop's** [2] - 44:13, 44:18
**laptops** [3] - 45:11, 46:19, 50:10
**large** [3] - 30:12, 30:22, 45:18
**last** [6] - 31:12, 31:16, 32:26, 41:12, 42:9, 43:1
**law** [2] - 6:13, 7:1
**lawyer** [3] - 46:12, 46:14, 46:24
**lawyer's** [1] - 3:12
**leading** [1] - 50:8
**learn** [1] - 7:14
**learned** [3] - 49:5, 49:8, 53:20
**least** [1] - 7:1
**leave** [1] - 38:12
**legal** [1] - 30:16
**legally** [1] - 11:10
**letters** [1] - 8:20
**level** [1] - 27:22
**life** [2] - 21:21, 21:23
**likely** [1] - 22:6
**limit** [1] - 33:20
**limitations** [3] - 20:12, 20:14, 25:20
**limited** [4] - 6:15, 25:24, 27:25, 48:25
**Linda** [2] - 42:15, 43:8
**line** [5] - 18:17, 41:8, 47:18, 48:11, 48:21
**linked** [1] - 34:25
**list** [4] - 42:14, 43:1, 43:3, 43:6
**locate** [2] - 9:7, 9:10
**log** [4] - 21:8, 30:22, 36:7, 50:20
**logged** [3] - 5:10, 5:22, 45:17
**logging** [1] - 29:8
**logical** [2] - 10:1, 25:16
**logs** [10] - 20:15,

5

36:4, 36:17, 36:20,
36:24, 36:27, 37:5,
53:7, 53:9, 56:13
**look** [10] - 7:23, 8:5,
8:18, 16:21, 26:8,
31:12, 31:16, 41:24,
41:26, 51:13
**looked** [2] - 7:11,
16:15
**looking** [5] - 7:12,
7:14, 27:7, 32:26,
45:8
**looks** [1] - 51:14
**loosely** [1] - 15:22

**M**

**m-hm** [6] - 19:1,
19:12, 23:3, 29:25,
40:3, 43:26
**mall** [10] - 33:13,
33:16, 33:17, 37:18,
37:22, 39:27, 40:8,
41:22, 51:11
**maintained** [1] -
25:14
**majority** [1] - 23:19
**Malware** [1] - 31:6
**management** [1] -
20:25
**manipulate** [1] -
29:21
**manipulated** [2] -
29:16, 30:13
**MARTIN** [4] - 1:40,
2:14, 3:1, 3:24
**Martin** [9] - 3:3, 3:21,
3:25, 4:10, 7:6, 7:19,
13:13, 14:6, 22:20
**Martin's** [1] - 6:27
**matter** [2] - 6:24,
28:6
**matters** [2] - 6:16,
48:24
**MAY** [3] - 1:36, 2:14,
3:24
**mean** [11] - 5:26, 9:5,
11:4, 17:21, 17:23,
19:4, 23:11, 44:20,
51:27, 55:26
**means** [1] - 34:5
**meeting** [1] - 51:10
**member** [2] - 30:21,
31:6
**mention** [1] - 39:3
**mentioned** [1] - 22:9
**message** [3] - 36:8,
40:2, 51:19
**Michael** [2] - 3:26,

4:4
**MICHAEL** [2] - 2:18,
4:7
**Microsoft** [1] - 7:17
**might** [2] - 29:11,
44:5
**mind** [3] - 4:20,
10:10, 49:4
**minds** [1] - 15:9
**minute** [3] - 13:23,
32:3, 56:5
**misspeak** [1] - 38:6
**misuse** [1] - 36:25
**mix** [2] - 18:26, 18:27
**MOHAMED** [2] - 1:13
**moment** [1] - 24:10
**Monday** [1] - 21:17
**money** [2] - 16:1,
16:4
**monitors** [1] - 34:18
**Morris** [2] - 42:15,
43:8
**most** [2] - 11:25,
40:19
**motion** [2] - 6:19, 7:3
**moved** [1] - 12:4
**MR** [82] - 3:2, 3:3,
3:14, 3:16, 3:20, 3:25,
4:3, 4:9, 4:14, 4:23,
5:16, 6:1, 6:4, 6:7,
6:13, 7:5, 7:10, 8:1,
8:12, 9:22, 9:25, 9:27,
13:8, 13:12, 13:25,
14:3, 14:19, 15:6,
15:9, 16:11, 16:15,
16:25, 17:5, 17:9,
21:23, 21:26, 22:16,
22:20, 24:11, 24:16,
26:14, 30:6, 30:10,
30:18, 30:21, 32:5,
33:3, 33:6, 33:9,
38:21, 39:12, 39:24,
40:11, 40:14, 40:18,
41:6, 41:11, 43:3,
43:17, 45:21, 45:23,
46:2, 46:26, 47:2,
47:5, 47:9, 47:12,
47:20, 47:25, 48:15,
48:27, 49:3, 49:10,
49:15, 50:2, 52:26,
53:5, 54:15, 55:1,
55:24, 56:8, 56:16
**MS** [87] - 3:15, 4:12,
4:21, 5:14, 5:24, 6:2,
6:6, 6:10, 7:3, 7:6,
9:20, 9:24, 13:6, 13:9,
13:23, 13:27, 15:4,
15:8, 16:9, 16:13,
16:17, 17:3, 21:22,
21:25, 22:14, 22:18,

24:9, 24:14, 24:18,
26:10, 30:5, 30:8,
30:16, 30:20, 32:3,
33:2, 33:5, 33:8,
38:14, 40:10, 40:12,
40:16, 41:3, 41:7,
45:19, 45:22, 45:25,
46:25, 47:1, 47:4,
47:7, 47:10, 47:17,
47:23, 48:4, 48:17,
49:1, 49:8, 49:14,
49:26, 53:2, 54:13,
54:24, 54:26, 55:10,
55:19, 56:5
**must** [2] - 18:8,
21:21

**N**

**name** [3] - 17:16,
42:22, 43:15
**named** [1] - 53:16
**names** [1] - 42:14,
43:1, 43:4, 43:7
**nature** [1] - 12:14
**necessarily** [1] -
24:20
**necessary** [1] -
43:19
**need** [4] - 24:12,
37:3, 46:1, 48:17
**Nell** [2] - 42:15, 43:7
**net** [25] - 25:17,
25:21, 25:22, 25:25,
26:3, 26:8, 26:13,
26:15, 26:17, 26:20,
26:22, 26:23, 26:24,
27:2, 27:5, 27:9,
27:12, 27:15, 27:16,
27:24, 28:4, 28:11,
28:12
**nets** [4] - 25:16,
25:25, 25:27, 26:16
**network** [82] - 10:4,
10:7, 10:8, 10:14,
10:15, 10:24, 17:15,
17:18, 17:19, 17:22,
18:15, 19:3, 19:4,
19:10, 19:11, 19:14,
19:22, 20:3, 20:4,
20:5, 20:9, 20:10,
20:20, 21:3, 21:5,
21:13, 22:4, 22:10,
22:23, 22:27, 23:5,
23:14, 23:17, 25:15,
25:16, 25:17, 25:27,
29:16, 29:19, 30:3,
30:14, 30:23, 31:7,
31:27, 34:20, 37:16,
38:8, 39:25, 40:23,

41:14, 41:19, 42:12,
42:18, 43:11, 43:18,
44:4, 44:7, 44:9,
44:11, 44:12, 44:16,
44:17, 44:19, 45:1,
45:6, 45:12, 46:17,
46:20, 49:16, 50:18,
50:19, 50:20, 50:24,
51:2, 51:6, 51:7,
51:15, 51:24, 52:10,
55:9, 55:18
**networks** [2] - 10:2,
29:20
**new** [6] - 12:4, 24:7,
24:26, 25:12, 36:11,
37:2
**newspaper** [2] -
50:1, 50:8
**nicer** [1] - 12:6
**NO** [1] - 2:11
**none** [2] - 14:4,
29:14
**Northern** [1] - 4:26
**notes** [1] - 57:8
**nothing** [1] - 40:6
**notice** [2] - 21:12,
50:14
**noticing** [1] - 21:10
**notorious** [1] - 50:6
**November** [6] - 7:4,
31:17, 31:24, 36:15,
40:22, 51:25
**number** [1] - 8:23
**numbers** [3] - 8:25,
18:19

**O**

**obligation** [2] - 48:3,
48:5
**obligations** [6] -
46:13, 47:13, 47:27,
48:16, 48:18, 48:19
**obliged** [1] - 47:22
**obtained** [1] - 53:27
**obviously** [3] - 9:23,
22:24, 23:16
**OF** [10] - 1:1, 1:2,
1:38, 2:7, 2:14, 2:18,
3:24, 4:7, 57:1
**OFF** [1] - 9:26
**office** [2] - 12:3, 12:5
**Official** [2] - 1:54,
57:22
**often** [1] - 24:16
**old** [2] - 27:10, 37:2
**oldest** [1] - 7:16
**ON** [1] - 1:35
**once** [1] - 14:12

**one** [15] - 9:13, 9:14,
10:14, 10:18, 19:26,
23:10, 23:14, 24:6,
25:15, 25:20, 29:20,
30:10, 32:16, 37:16,
40:25, 42:9, 42:13,
42:22, 43:15
**onerous** [1] - 12:26
**ones** [1] - 37:17
**ongoing** [1] - 45:24
**online** [2] - 33:13,
38:26
**operating** [1] - 22:1
**operation** [2] -
11:20, 11:21
**operational** [4] -
15:20, 15:27, 17:24,
27:22
**operations** [8] -
8:15, 18:1, 18:8,
27:20, 52:10, 52:21,
52:22, 52:23
**operator** [5] - 21:27,
22:1, 44:11, 44:17,
44:20
**opinion** [3] - 5:25,
16:9, 16:14
**order** [6] - 4:27, 5:3,
5:6, 5:17, 8:17, 28:25
**organization** [1] -
15:23
**original** [1] - 3:10
**originated** [3] -
10:26, 10:27, 51:4
**originating** [1] - 36:8
**outgoing** [1] - 51:19
**outside** [3] - 16:23,
45:6, 45:11
**own** [3] - 49:25,
50:19, 54:2

**P**

**P.M** [1] - 56:19
**p.m** [1] - 21:17
**page** [2] - 5:11, 42:9
**PAGE** [1] - 2:11
**pages** [2] - 8:23,
57:6
**paper** [1] - 31:13
**paragraph** [6] - 52:2,
53:5, 53:14, 55:24,
55:27, 56:3
**paragraphs** [1] -
53:25
**pardon** [3] - 23:23,
33:2, 53:23
**part** [2] - 11:25,
13:14

6

particular [2] - 14:1, 22:15
party [2] - 48:7, 49:2
passing [1] - 50:21
password [1] - 43:22
path [2] - 35:25, 35:26
patience [2] - 30:6
patient [7] - 16:27, 29:24, 30:1, 40:14, 40:27, 41:4, 45:14
pay [2] - 12:2, 12:3
pediatric [4] - 29:8, 37:17, 38:10, 38:12
pediatrics [1] - 37:25
people [14] - 6:20, 6:23, 11:5, 16:2, 16:3, 28:2, 38:6, 42:17, 43:10, 52:22, 52:24, 54:1, 54:5, 54:8
perform [2] - 10:13, 12:26
perhaps [3] - 7:10, 48:13, 52:17
period [3] - 25:7, 25:11, 37:3
periods [1] - 8:24
permanently [1] - 35:3
permitted [1] - 6:24
person [8] - 6:19, 7:12, 14:21, 44:21, 50:17, 51:12
personal [15] - 8:12, 18:17, 28:15, 32:21, 32:27, 33:4, 33:7, 33:11, 33:12, 33:13, 33:17, 33:21, 39:18, 52:17, 53:12
personally [1] - 27:23
photocopy [1] - 3:11
physical [1] - 34:16
pinpoint [2] - 21:14, 21:19
place [5] - 16:8, 36:15, 40:6, 41:21, 46:16
Plaintiffs [3] - 1:15, 1:47, 1:49
play [1] - 36:14
plug [2] - 19:4, 44:6
point [5] - 4:13, 6:17, 6:18, 15:24, 28:17, 41:8, 49:3, 50:9, 55:2
policies [29] - 13:1, 13:15, 13:17, 13:22, 14:1, 14:9, 14:15, 14:20, 15:10, 15:11, 15:13, 15:21, 15:25,

16:7, 16:16, 17:1, 17:10, 17:11, 18:9, 22:2, 27:21, 32:6, 32:10, 32:13, 32:16, 32:19, 46:16, 55:22
policy [21] - 13:24, 27:19, 28:6, 28:10, 30:4, 30:9, 33:8, 33:9, 33:19, 36:23, 37:4, 37:7, 37:9, 37:13, 37:15, 39:2, 39:5, 39:15, 55:7, 55:15, 55:20
polite [1] - 40:19
porn [2] - 38:25, 39:3
portable [1] - 43:24
portal [1] - 23:14
portions [1] - 21:4
position [1] - 47:17
possible [8] - 7:24, 8:7, 10:23, 40:19, 41:12, 41:13, 51:1, 53:15
posted [1] - 7:4
postings [1] - 49:24
practice [1] - 28:20
predecessor [1] - 14:16
predict [1] - 25:8
premises [2] - 44:24, 45:17
pretty [1] - 18:13
prevent [3] - 40:7, 46:17, 47:6
previously [3] - 38:18, 48:9, 48:22
problem [4] - 3:5, 22:5, 22:6, 45:24
problems [2] - 21:10, 21:15
procedure's [1] - 3:7
proceeding [1] - 45:27
PROCEEDINGS [1] - 56:19
proceedings [2] - 48:26, 57:7
procured [1] - 23:5
procurement [1] - 13:1
produce [1] - 51:26
production [1] - 37:1
PROFESSIONAL [1] - 1:13
prohibit [3] - 32:12, 32:13, 32:16
project [2] - 7:17, 15:20
propagating [1] - 32:13

proper [1] - 6:23
proportion [1] - 28:23
protect [1] - 29:3
protecting [3] - 12:20, 13:20, 32:10
provide [1] - 48:10
provided [3] - 48:8, 52:9, 52:12
provider [1] - 23:6
provides [1] - 10:1
providing [2] - 7:25, 8:8
Province [1] - 57:10
province [1] - 6:14
provincial [1] - 11:23
provision [1] - 50:17
public [4] - 30:12, 30:21, 31:6, 50:6
publically [2] - 40:24, 41:15
purely [2] - 20:25, 45:19
purpose [2] - 28:26, 32:18
purposes [2] - 37:8, 38:16
put [6] - 4:18, 36:11, 36:13, 44:26, 49:23, 50:3
putting [1] - 48:20

**Q**

Q.C [1] - 1:47
qualification [1] - 55:26
qualifications [1] - 7:13
qualifies [2] - 12:22, 12:25
QUEEN'S [1] - 1:1
questioning [4] - 41:8, 47:18, 48:11, 48:21
questions [5] - 4:19, 9:20, 16:22, 17:14, 46:1
quoted [1] - 52:4

**R**

R.B [1] - 1:47
racist [3] - 32:14, 38:17, 39:4
range [4] - 27:12, 27:17, 27:25, 28:13
RATEMDS [16] -

4:27, 5:3, 5:7, 5:10, 5:18, 6:21, 7:11, 7:23, 8:5, 31:26, 32:8, 35:10, 35:23, 35:25, 36:6, 44:17
RATEMDS.com [1] - 9:2
rather [1] - 6:16
reached [1] - 16:12
read [9] - 4:1, 6:3, 8:1, 15:9, 39:6, 43:3, 43:4, 54:17, 55:10
reading [6] - 4:24, 8:2, 39:14, 43:5, 54:19, 55:12
really [2] - 34:15, 52:1
reason [5] - 7:22, 8:3, 37:4, 46:6, 52:16
receive [2] - 10:15, 49:21
receives [1] - 51:12
recognize [2] - 42:21, 43:15
reconfigured [1] - 21:3
record [5] - 9:25, 20:6, 24:9, 51:23, 53:3
RECORD [1] - 9:26
records [6] - 42:21, 42:27, 43:15, 48:7, 48:10, 49:2
refer [1] - 37:3
referred [1] - 38:18
referring [1] - 56:6
refers [1] - 34:1
refresh [6] - 24:19, 24:25, 25:1, 25:3, 25:7, 25:11
refuse [1] - 17:6
regards [1] - 15:15
regional [1] - 11:23
reinforce [1] - 47:16
relate [1] - 48:19
related [4] - 6:11, 48:23, 48:24, 49:27
relates [2] - 7:3, 48:8
relating [3] - 41:13, 55:7, 55:15
relationship [1] - 40:27
relevance [3] - 7:9, 16:18, 48:1
relevancy [1] - 47:24
relevant [13] - 6:6, 6:9, 6:10, 6:17, 6:22, 16:24, 30:5, 40:10, 40:17, 47:21, 47:26, 48:12, 48:13

relied [1] - 52:19
removed [2] - 46:19, 49:18
removing [2] - 44:24, 44:25
repeat [2] - 17:8, 44:14
report [1] - 51:26, 51:27
REPORTER [6] - 8:2, 24:12, 39:14, 43:5, 54:19, 55:12
Reporter [2] - 1:54, 57:22
request [1] - 5:13
requested [1] - 14:8
required [1] - 21:13
requirements [2] - 21:4, 50:22
requires [2] - 12:27, 46:7
resources [2] - 16:5, 16:6
respect [2] - 4:9, 14:5
responded [1] - 6:19
responsibilities [2] - 11:24, 13:14
responsible [8] - 12:19, 13:10, 13:17, 14:20, 17:16, 17:20, 17:21, 52:20
restricted [6] - 23:21, 23:25, 25:24, 28:11, 28:24, 41:18
restriction [5] - 19:24, 28:26, 37:19, 49:22
restrictions [13] - 19:3, 19:6, 23:18, 23:20, 25:9, 25:13, 25:22, 25:26, 29:13, 38:4, 38:19, 38:21, 40:4
result [2] - 11:20, 53:27
review [2] - 15:21, 17:9
reviewed [2] - 14:23, 15:10
reviewing [1] - 15:25
reviews [1] - 18:13
revise [1] - 15:21
risk [1] - 18:5
ritual [1] - 3:6
ROBERT [4] - 1:40, 2:14, 3:1, 3:24
Robert [1] - 3:21
roughly [4] - 19:13, 19:16, 20:20, 28:23

7

RPR [2] - 1:54, 57:21
rule [2] - 46:3, 46:5
Rule [1] - 48:7
rules [1] - 36:25
running [1] - 34:12
runs [1] - 34:27

**S**

S.N [1] - 1:51
sake [1] - 3:7
San [1] - 4:26
satisfy [1] - 7:21
satisfying [1] - 50:21
scary [2] - 31:27, 32:9
scheduled [1] - 15:21
Schultz [1] - 1:49
scope [2] - 11:23, 12:13
Scott [2] - 42:15, 43:9
second [7] - 31:12, 31:16, 32:26, 41:12, 45:8, 49:6, 52:3
second-last [4] - 31:12, 31:16, 32:26, 41:12
security [6] - 12:19, 13:19, 18:4, 33:22, 39:20, 41:16
see [13] - 8:20, 16:18, 21:7, 30:7, 31:14, 35:21, 39:2, 40:16, 47:20, 47:27, 49:4, 49:27
seeing [1] - 40:20
semantics [1] - 34:9
send [6] - 10:24, 37:18, 40:8, 49:21, 51:2, 51:12
sending [3] - 33:16, 33:17, 40:1
sends [1] - 51:9
senior [1] - 7:16
sense [3] - 15:25, 20:25, 21:25
sent [5] - 36:2, 36:8, 41:22, 45:18, 46:21
sentence [3] - 52:3, 55:25, 56:6
separated [1] - 8:24
separation [2] - 10:1, 10:2
series [2] - 8:23, 25:16
server [1] - 20:7
service [3] - 10:12,

23:6, 42:11
Services [10] - 1:52, 11:8, 11:17, 11:20, 11:22, 12:21, 14:18, 15:23, 37:22, 52:6
Services' [2] - 12:9, 48:9
set [1] - 34:19
setting [2] - 13:2, 13:3
seven [3] - 24:19, 24:24, 24:26
sexist [1] - 38:17
sheet [1] - 31:12
Sheet [2] - 8:18, 8:22
shorthand [2] - 57:7, 57:8
shortly [1] - 30:7
shot [1] - 39:7
show [1] - 36:5
showing [3] - 3:7, 42:14, 43:6
shown [1] - 3:25
shows [2] - 31:24, 36:7
sic [2] - 5:23, 19:16
simply [1] - 12:13
single [6] - 10:18, 20:26, 20:27, 25:25, 51:26, 51:27
site [26] - 5:10, 5:23, 6:8, 6:21, 7:11, 7:12, 7:15, 7:23, 8:5, 9:15, 31:26, 32:8, 35:11, 35:23, 40:1, 40:25, 41:15, 41:21, 43:25, 44:2, 44:8, 45:5, 49:7, 49:18, 50:11, 53:17
sites [7] - 38:19, 38:22, 38:23, 38:24, 38:25, 38:27
sitting [1] - 37:23
situations [2] - 21:9, 28:27
skill [1] - 57:9
small [1] - 8:20
software [7] - 13:2, 13:5, 34:12, 34:18, 34:24, 34:27
solely [1] - 17:20
someone [6] - 30:12, 31:26, 40:7, 43:17, 52:14, 52:19
sometimes [1] - 23:12
somewhere [1] - 20:6
son [1] - 7:16
Sorochan [3] - 3:26, 4:4, 31:20

SOROCHAN [2] - 2:18, 4:7
Sorochan's [3] - 4:18, 4:24, 49:5
sorry [34] - 5:2, 9:20, 11:14, 12:15, 12:16, 12:18, 13:6, 15:27, 16:25, 17:23, 20:26, 23:22, 24:23, 24:24, 26:12, 29:4, 29:26, 29:27, 34:9, 35:15, 35:20, 38:2, 38:5, 40:16, 43:2, 43:27, 44:1, 44:14, 46:4, 46:5, 54:6, 54:7, 55:27, 56:3
sought [5] - 7:26, 8:10, 54:10, 54:21, 55:3
speaking [3] - 18:15, 20:13, 26:18
specific [12] - 4:13, 9:21, 13:24, 20:11, 20:18, 21:6, 25:21, 28:4, 28:13, 32:11, 32:12
specifically [5] - 8:26, 12:8, 13:19, 47:14, 49:1
specified [1] - 27:17
specify [1] - 37:15
staff [6] - 32:20, 33:10, 33:19, 37:8, 38:16, 39:16
stamped [1] - 31:14
start [2] - 7:21, 18:16
started [1] - 7:7
statement [1] - 31:22
statements [2] - 4:19, 48:20
States [2] - 4:25, 8:18
staying [1] - 8:17
stickler [1] - 15:15
still [3] - 7:8, 31:11, 38:3
strikes [1] - 22:20
struggling [3] - 7:8, 16:17, 16:26
stuck [1] - 47:27
sub [30] - 25:16, 25:17, 25:21, 25:22, 25:25, 25:27, 26:3, 26:8, 26:13, 26:15, 26:17, 26:20, 26:22, 26:23, 26:24, 27:2, 27:5, 27:9, 27:12, 27:15, 27:16, 27:24, 28:4, 28:11, 28:12

sub-net [25] - 25:17, 25:21, 25:22, 25:25, 26:3, 26:8, 26:13, 26:15, 26:17, 26:20, 26:22, 26:23, 26:24, 27:2, 27:5, 27:9, 27:12, 27:15, 27:16, 27:24, 28:4, 28:11, 28:12
sub-nets [4] - 25:16, 25:25, 25:27, 26:16
sub-network [1] - 25:17
subject [1] - 6:23
SUBJECT [1] - 56:20
submission [1] - 49:27
subpoena [1] - 5:12
succinctly [1] - 49:23
sufficient [1] - 17:19
sufficiently [1] - 50:6
sums [1] - 18:13
SuperNet [1] - 23:8
supervise [2] - 17:26, 17:27
supposed [1] - 37:20
SWORN [6] - 1:36, 2:14, 2:18, 3:1, 3:24, 4:7
sworn [2] - 3:21, 4:4
synonymous [1] - 10:11
system [7] - 36:12, 36:13, 36:14, 36:19, 37:2, 37:5
systems [3] - 13:21, 29:23, 32:11

**T**

taught [1] - 7:18
team [4] - 17:25, 18:1, 18:3, 52:10
technical [9] - 13:20, 21:11, 21:12, 21:18, 28:2, 37:4, 41:16, 54:5, 54:8
technologies [3] - 33:23, 39:9, 39:22
Telus [4] - 23:8, 42:1, 42:5, 42:10
term [2] - 18:5, 23:12
terminology [1] - 25:17
test [1] - 40:20
THE [4] - 1:1, 9:26, 24:12, 56:20
theoretical [2] - 8:13,

8:15
theoretically [2] - 20:12, 36:4
theory [1] - 28:19
therefore [5] - 22:24, 26:26, 30:12, 34:8, 40:6
thinking [1] - 43:2
third [5] - 8:19, 8:22, 45:9, 48:7, 49:2
third-party [2] - 48:7, 49:2
thousand [1] - 19:15
thrust [2] - 50:1, 50:2
timing [1] - 15:20
title [2] - 12:15, 12:18
TO [1] - 56:20
took [1] - 44:5
top [3] - 10:12, 26:2, 41:26
tough [2] - 21:21, 21:24
trace [1] - 20:10
track [3] - 22:7, 55:8, 55:16
tracking [1] - 45:4
traffic [2] - 55:8, 55:16
transcribed [1] - 57:8
TRANSCRIPT [1] - 57:1
transcript [1] - 57:6
Trojan [1] - 30:27
trouble [1] - 14:7
true [4] - 3:8, 3:13, 31:21, 57:6
trust [1] - 40:7
try [2] - 32:24, 35:15
trying [2] - 26:12, 34:14
turn [3] - 5:4, 5:8, 5:18
turned [1] - 55:3
turns [2] - 47:20, 47:25
two [4] - 8:23, 10:2, 10:26, 10:27
typical [1] - 33:14

**U**

unable [2] - 21:19, 49:23
under [8] - 5:12, 8:22, 17:3, 24:6, 48:3, 48:16, 48:18, 48:19
undersigned [1] -

57:5

**UNDERTAKINGS** [1]
- 56:20
 **unfortunately** [1] -
36:10
 **unique** [3] - 9:11,
20:1, 51:21
 **United** [2] - 4:25,
8:17
 **unrelated** [4] - 41:9,
45:27, 48:11, 48:22
 **unrestricted** [4] -
26:3, 37:27, 38:2,
38:8
 **up** [7] - 13:2, 13:4,
13:6, 14:8, 18:14,
34:16, 47:15
 **Up** [2] - 42:1, 42:6
 **upgrade** [1] - 36:10
 **usage** [1] - 45:5
 **user** [5] - 32:16,
37:16, 38:22, 43:19,
44:15
 **username** [1] - 43:22
 **users** [3] - 21:9,
32:6, 38:24
 **uses** [1] - 43:17

**V**

 **various** [1] - 29:22
 **vast** [1] - 23:19
 **verify** [1] - 42:27
 **versus** [1] - 11:23
 **via** [1] - 23:1
 **viruses** [2] - 31:1,
31:5
 **vis** [2] - 7:9
 **vis-a-vis** [1] - 7:9
 **visiting** [1] - 40:1
 **voice** [1] - 29:4

**W**

 **wait** [2] - 13:23, 32:3
 **wants** [1] - 30:24
 **warrant** [1] - 30:13
 **Washington** [1] -
7:17
 **ways** [2] - 22:17,
54:8
 **web** [17] - 5:10, 5:23,
6:8, 6:21, 7:11, 7:12,
7:15, 7:23, 8:5, 9:15,
31:26, 35:10, 35:23,
40:24, 41:15, 41:20,
53:17
 **Web** [5] - 8:14, 8:16,

10:6, 10:10, 10:11
 **webMD** [1] - 5:23
 **week** [3] - 20:16,
24:4, 24:15
 **Weigl** [2] - 1:54,
57:21
 **whatsoever** [1] -
41:21
 **whichever** [1] -
10:26
 **White** [1] - 1:47
 **WHITE** [82] - 3:2, 3:3,
3:14, 3:16, 3:20, 3:25,
4:3, 4:9, 4:14, 4:23,
5:16, 6:1, 6:4, 6:7,
6:13, 7:5, 7:10, 8:1,
8:12, 9:22, 9:25, 9:27,
13:8, 13:12, 13:25,
14:3, 14:19, 15:6,
15:9, 16:11, 16:15,
16:25, 17:5, 17:9,
21:23, 21:26, 22:16,
22:20, 24:11, 24:16,
26:14, 30:6, 30:10,
30:18, 30:21, 32:5,
33:3, 33:6, 33:9,
38:21, 39:12, 39:24,
40:11, 40:14, 40:18,
41:6, 41:11, 43:3,
43:17, 45:21, 45:23,
46:2, 46:26, 47:2,
47:5, 47:9, 47:12,
47:20, 47:25, 48:15,
48:27, 49:3, 49:10,
49:15, 50:2, 52:26,
53:5, 54:15, 55:1,
55:24, 56:8, 56:16
 **Wide** [5] - 8:14, 8:16,
10:6, 10:10, 10:11
 **wife's** [1] - 10:19
 **witness** [6] - 7:9,
40:22, 47:14, 48:20,
49:23, 55:19
 **word** [1] - 40:25
 **wording** [2] - 15:15,
15:16
 **words** [1] - 3:17
 **world** [1] - 10:25
 **World** [5] - 8:14,
8:16, 10:6, 10:10,
10:11
 **worms** [2] - 31:3,
31:5
 **write** [1] - 51:11
 **written** [1] - 5:19
 **www.RATEMDS.
com** [1] - 6:5

**Y**

 **year** [1] - 14:2
 **years** [2] - 7:2, 12:23
 **yesterday's** [1] -
50:7
 **yourself** [2] - 6:5,
13:3

*A.C.E. Reporting Services Inc.*

*Phone: (780, 497-4223*